(Slip Opinion) OCTOBER TERM, 2006 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## FEDERAL ELECTION COMMISSION *v.* WISCONSIN RIGHT TO LIFE, INC.

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

No. 06–969.   Argued April 25, 2007—Decided June 25, 2007*

Section 203 of the Bipartisan Campaign Reform Act of 2002 (BCRA), makes it a federal crime for a corporation to use its general treasury funds to pay for any "electioneering communication," 2 U. S. C. §441b(b)(2), which BCRA defines as any broadcast that refers to a candidate for federal office and is aired within 30 days of a federal primary election or 60 days of a federal general election in the jurisdiction where that candidate is running, §434(f)(3)(A). In *McConnell* v. *Federal Election Comm'n,* 540 U. S. 93, this Court upheld §203 against a First Amendment facial challenge even though the section encompassed not only campaign speech, or "express advocacy" promoting a candidate's election or defeat, but also "issue advocacy," or speech about public issues more generally, that also mentions such a candidate. The Court concluded there was no overbreadth concern to the extent the speech in question was the "functional equivalent" of express advocacy. *Id.*, at 204–205, 206.

On July 26, 2004, appellee Wisconsin Right to Life, Inc. (WRTL), began broadcasting advertisements declaring that a group of Senators was filibustering to delay and block federal judicial nominees and telling voters to contact Wisconsin Senators Feingold and Kohl to urge them to oppose the filibuster. WRTL planned to run the ads throughout August 2004 and finance them with its general treasury funds. Recognizing, however, that as of August 15, 30 days before the Wisconsin primary, the ads would be illegal "electioneering communication[s]" under BCRA §203, but believing that it nonetheless

——————

*Together with No. 06–970, *McCain, United States Senator, et al.* v. *Wisconsin Right to Life, Inc.,* also on appeal from the same court.

2    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Syllabus

had a First Amendment right to broadcast them, WRTL filed suit against the Federal Election Commission (FEC), seeking declaratory and injunctive relief and alleging that §203's prohibition was unconstitutional as applied to the three ads in question, as well as any materially similar ads WRTL might run in the future. Just before the BCRA blackout, the three-judge District Court denied a preliminary injunction, concluding that *McConnell*'s reasoning that §203 was not facially overbroad left no room for such "as-applied" challenges. WRTL did not run its ads during the blackout period, and the court subsequently dismissed the complaint. This Court vacated that judgment, holding that *McConnell* "did not purport to resolve future as-applied challenges" to §203. *Wisconsin Right to Life, Inc.* v. *Federal Election Comm'n* (*WRTL I*), 546 U. S. 410, 412. On remand, the District Court granted WRTL summary judgment, holding §203 unconstitutional as applied to the three ads. The court first found that adjudication was not barred by mootness because the controversy was capable of repetition, yet evading review. On the merits, it concluded that the ads were genuine issue ads, *not* express advocacy or its "functional equivalent" under *McConnell,* and held that no compelling interest justified BCRA's regulation of such ads.

*Held:* The judgment is affirmed.

466 F. Supp. 2d 195, affirmed.

THE CHIEF JUSTICE delivered the opinion of the Court with respect to Parts I and II, concluding that the Court has jurisdiction to decide these cases. The FEC argues that the cases are moot because the 2004 election has passed and WRTL neither asserts a continuing interest in running its ads nor identifies any reason to believe that a significant dispute over Senate filibusters of judicial nominees will occur in the foreseeable future. These cases, however, fit comfortably within the established exception to mootness for disputes capable of repetition, yet evading review. That exception applies where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again," *Spencer* v. *Kemna*, 523 U. S. 1, 17. Both circumstances are present here. First, it would be unreasonable to expect that WRTL could have obtained complete judicial review of its claims in time to air its ads during the BCRA blackout periods. Indeed, *two* BCRA blackout periods have passed during the pendency of this action. Second, there exists a reasonable expectation that the same "controversy" involving the same party will recur: WRTL has credibly claimed that it plans to run materially similar targeted ads during future blackout periods, and there is no reason to believe that the FEC will refrain from prosecuting future BCRA violations. Pp. 7–10.

Syllabus

THE CHIEF JUSTICE, joined by JUSTICE ALITO, concluded that BCRA §203 is unconstitutional as applied to the ads at issue in these cases. Pp. 10–29.

1. The speech at issue is not the "functional equivalent" of express campaign speech. Pp. 10–22.

(a) Appellants are wrong in arguing that WRTL has the burden of demonstrating that §203 is unconstitutional. Because §203 burdens political speech, it is subject to strict scrutiny, see, *e.g., McConnell, supra,* at 205, under which the *Government* must prove that applying BCRA to WRTL's ads furthers a compelling governmental interest and is narrowly tailored to achieve that interest, see *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 786. Given that *McConnell, supra,* at 206, already ruled that BCRA survives strict scrutiny to the extent it regulates express advocacy or its functional equivalent, the FEC's burden is not onerous insofar as these ads fit this description. Pp. 10–11.

(b) Contrary to the FEC's contention, *McConnell,* 540 U. S., at 205–206, did not establish an intent-and-effect test for determining if a particular ad is the functional equivalent of express advocacy. Indeed, *McConnell* did not adopt any test for future as-applied challenges, but simply grounded its analysis in the evidentiary record, which included two key studies that separated ads based on whether they were intended to, or had the effect of, supporting candidates for federal office. *Id.,* at 308–309. More importantly, *Buckley* v. *Valeo*, 424 U. S. 1, 14, 43–44, rejected an intent-and-effect test for distinguishing between discussions of issues and candidates, and *McConnell* did not purport to overrule *Buckley* on this point—or even address what *Buckley* had to say on the subject. Pp. 11–15.

(c) Because WRTL's ads may reasonably be interpreted as something other than an appeal to vote for or against a specific candidate, they are not the functional equivalent of express advocacy, and therefore fall outside *McConnell*'s scope. To safeguard freedom of speech on public issues, the proper standard for an as-applied challenge to BCRA §203 must be objective, focusing on the communication's substance rather than on amorphous considerations of intent and effect. See *Buckley, supra*, at 43–44. It must entail minimal if any discovery, to allow parties to resolve disputes quickly without chilling speech through the threat of burdensome litigation. See *Virginia* v. *Hicks*, 539 U. S. 113, 119. And it must eschew "the open-ended rough-and-tumble of factors," which "invit[es] complex argument in a trial court and a virtually inevitable appeal." *Jerome B. Grubart, Inc.* v. *Great Lakes Dredge & Dock Co.*, 513 U. S. 527, 547. In short, it must give the benefit of any doubt to protecting rather than stifling speech. See *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 269–270.

In light of these considerations, a court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate. WRTL's three ads are plainly not the functional equivalent of express advocacy under this test. First, their content is consistent with that of a genuine issue ad: They focus and take a position on a legislative issue and exhort the public to adopt that position and to contact public officials with respect to the matter. Second, their content lacks indicia of express advocacy: They do not mention an election, candidacy, political party, or challenger; and they take no position on a candidate's character, qualifications, or fitness for office. Pp. 15–22.

2. Because WRTL's ads are not express advocacy or its functional equivalent, and because appellants identify no interest sufficiently compelling to justify burdening WRTL's speech, BCRA §203 is unconstitutional as applied to the ads. The section can be constitutionally applied only if it is narrowly tailored to further a compelling interest. *E.g., McConnell, supra*, at 205. None of the interests that might justify regulating WRTL's ads are sufficiently compelling. Although the Court has long recognized "the governmental interest in preventing corruption and the appearance of corruption" in election campaigns, *Buckley*, 424 U. S., at 45, it has invoked this interest as a reason for upholding *contribution* limits, *id.,* at 26–27, and suggested that it might also justify limits on electioneering *expenditures* posing the same dangers as large contributions, *id.,* at 45. *McConnell* arguably applied this interest to ads that were the "functional equivalent" of express advocacy. See 540 U. S., at 204–206. But to justify regulation of WRTL's ads, this interest must be stretched yet another step to ads that are *not* the functional equivalent of express advocacy. Issue ads like WRTL's are not equivalent to contributions, and the corruption interest cannot justify regulating them. A second possible compelling interest lies in addressing "the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas." *Austin* v. *Michigan Chamber of Commerce*, 494 U. S. 652, 660. *McConnell* held that this interest justifies regulating the "functional equivalent" of campaign speech, 540 U. S., at 205–206. This interest cannot be extended further to apply to genuine issue ads like WRTL's, see, *e.g., id.,* at 206, n. 88, because doing so would call into question this Court's holdings that the corporate identity of a speaker does not strip corporations of all free speech rights. *WRTL I* reinforced the validity of this point by holding §203 susceptible to as-applied challenges. 546 U. S., at 411–412. Pp. 23–28.

3. These cases present no occasion to revisit *McConnell*'s holding that a corporation's express advocacy of a candidate or his opponent shortly before an election may be prohibited, along with the functional equivalent of such express advocacy. But when it comes to defining what speech qualifies as the functional equivalent of express advocacy subject to such a ban—the question here—the Court should give the benefit of the doubt to speech, not censorship. Pp. 28–29.

JUSTICE SCALIA, joined by JUSTICE KENNEDY and JUSTICE THOMAS, agreed that the Court has jurisdiction in these cases and concurred in the Court's judgment because he would overrule that part of *McConnell* v. *Federal Election Comm'n*, 540 U. S. 93, upholding §203(a) of the Bipartisan Campaign Reform Act of 2002 (BCRA). Pp. 4–23.

1. The pertinent case law begins with *Buckley* v. *Valeo*, 424 U. S. 1, in which the Court held, *inter alia,* that a federal limitation on campaign expenditures not made in coordination with a candidate's campaign (contained in the Federal Election Campaign Act of 1971 (FECA)) was unconstitutional, *id.*, at 39–51. In light of vagueness concerns, the Court narrowly construed the independent-expenditure provision to cover only express advocacy of the election or defeat of a clearly identified candidate for federal office by use of such magic words "as 'vote for,' 'elect,' . . . 'vote against,' 'defeat,' 'reject.'" *Id.*, at 44, and n. 52. This narrowing construction excluded so-called "issue advocacy" referring to a clearly identified candidate's position on an issue, but not expressly advocating his election or defeat. Even as narrowly construed, however, the Court struck the provision down. *Id.*, at 45–46. Despite *Buckley,* some argued that independent expenditures *by corporations* should be treated differently. A post-*Buckley* case, *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 776–777, struck down, on First Amendment grounds, a state statute prohibiting corporations from spending money in connection with a referendum. The Court strayed far from these principles, however, in *Austin* v. *Michigan Chamber of Commerce*, 494 U. S. 652, upholding state restrictions on corporations' independent expenditures in support of, or in opposition to, candidates for state office, *id.*, at 654–655. *Austin* was wrongly decided, but at least it was limited to express advocacy. *Nonexpress* advocacy was presumed to remain protected under *Buckley* and *Bellotti,* even when engaged in by corporations, until *McConnell*. *McConnell* held, *inter alia,* that the compelling governmental interest supporting restrictions on corporate expenditures for express advocacy—*i.e., Austin*'s perceived "corrosive and distorting effects of immense aggregations of [corporate] wealth," 540 U. S., at 205—also justified extending those restrictions to ads run during the BCRA blackout period "to the extent . . . [they] are *the functional equivalent of express advocacy,*" *id.*, at 206 (emphasis added).

*McConnell* upheld BCRA §203(a) against a facial challenge. Subsequently, in *Wisconsin Right to Life, Inc.* v. *Federal Election Comm'n*, 546 U. S. 410, 411–412, the Court held that *McConnell* did not foreclose as-applied challenges to §203. Pp. 4–10.

2. *McConnell*'s holding concerning §203 was wrong. The answer to whether WRTL meets the standard for prevailing in an as-applied challenge requires the Court to articulate the standard. The most obvious standard is *McConnell*'s, which asks whether an ad is the "functional equivalent of express advocacy," 540 U. S., at 206. The fundamental and inescapable problem with this test, with the principal opinion's susceptible-of-no-other-reasonable-interpretation standard, and with other similar tests is that each is impermissibly vague and thus ineffective to vindicate the fundamental First Amendment rights at issue. *Buckley* itself compelled the conclusion that such tests fall short when it narrowed the statutory language there at issue to cover only advertising that used the magic words of express advocacy. 424 U. S., at 43–44. The only plausible explanation for *Buckley*'s "highly strained" reading of FECA, *McConnell, supra*, at 280, is that the Court there eschewed narrowing constructions that would have been more faithful to FECA's text and more effective at capturing campaign speech *because those tests were all too vague.* If *Buckley* foreclosed such vagueness in a statutory test, it also must foreclose such vagueness in an as-applied test. Yet any clear rule that would protect all genuine issue ads would cover such a substantial number of ads prohibited by §203 that §203 would be rendered substantially overbroad. Thus, *McConnell* (which presupposed the availability of as-applied challenges) was mistaken. Pp. 10–18.

3. *Stare decisis* would not prevent the Court from overruling *McConnell*'s §203 holding. This Court's "considered practice" is not to apply that principle "as rigidly in constitutional as in nonconstitutional cases," *Glidden Co.* v. *Zdanok*, 370 U. S. 530, 543, and it has not hesitated to overrule a decision offensive to the First Amendment that was decided just a few years earlier, see *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 642. Pp. 19–22.

ROBERTS, C. J., announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and II, in which SCALIA, KENNEDY, THOMAS, and ALITO, JJ., joined, and an opinion with respect to Parts III and IV, in which ALITO, J., joined. ALITO, J., filed a concurring opinion. SCALIA, J., filed an opinion concurring in part and concurring in the judgment, in which KENNEDY and THOMAS, JJ., joined. SOUTER, J., filed a dissenting opinion, in which STEVENS, GINSBURG, and BREYER, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

Nos. 06–969 and 06–970

FEDERAL ELECTION COMMISSION, APPELLANT
06–969　　　　　　　　 *v.*
WISCONSIN RIGHT TO LIFE, INC.


SENATOR JOHN McCAIN, ET AL., APPELLANTS
06–970　　　　　　　　 *v.*
WISCONSIN RIGHT TO LIFE, INC.

ON APPEALS FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

[June 25, 2007]

CHIEF JUSTICE ROBERTS announced the judgment of the Court and delivered the opinion of the Court with respect to Parts I and II, and an opinion with respect to Parts III and IV, in which JUSTICE ALITO joins.

Section 203 of the Bipartisan Campaign Reform Act of 2002 (BCRA), 116 Stat. 91, 2 U. S. C. §441b(b)(2) (2000 ed., Supp. IV), makes it a federal crime for any corporation to broadcast, shortly before an election, any communication that names a federal candidate for elected office and is targeted to the electorate. In *McConnell* v. *Federal Election Comm'n*, 540 U. S. 93 (2003), this Court considered whether §203 was facially overbroad under the First Amendment because it captured within its reach not only campaign speech, or "express advocacy," but also speech about public issues more generally, or "issue advocacy," that mentions a candidate for federal office. The Court

2    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of ROBERTS, C. J.

concluded that there was no overbreadth concern to the extent the speech in question was the "functional equivalent" of express campaign speech. *Id.*, at 204–205, 206. On the other hand, the Court "assume[d]" that the interests it had found to "justify the regulation of campaign speech might not apply to the regulation of genuine issue ads." *Id.,* at 206, n. 88. The Court nonetheless determined that §203 was not facially overbroad. Even assuming §203 "inhibit[ed] some constitutionally protected corporate and union speech," the Court concluded that those challenging the law on its face had failed to carry their "heavy burden" of establishing that *all* enforcement of the law should therefore be prohibited. *Id.,* at 207.

Last Term, we reversed a lower court ruling, arising in the same litigation before us now, that our decision in *McConnell* left "no room" for as-applied challenges to §203. App. to Juris. Statement 52a. We held on the contrary that "[i]n upholding §203 against a facial challenge, we did not purport to resolve future as-applied challenges." *Wisconsin Right to Life, Inc.* v. *Federal Election Comm'n*, 546 U. S. 410, 411–412 (2006) (*per curiam*) (*WRTL I*).

We now confront such an as-applied challenge. Resolving it requires us first to determine whether the speech at issue is the "functional equivalent" of speech expressly advocating the election or defeat of a candidate for federal office, or instead a "genuine issue a[d]." *McConnell, supra,* at 206, and n. 88. We have long recognized that the distinction between campaign advocacy and issue advocacy "may often dissolve in practical application. Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions." *Buckley* v. *Valeo*, 424 U. S. 1, 42 (1976) (*per curiam*). Our development of the law in this area requires us, however, to draw such a line, because we have recognized that the interests held to justify the regulation of campaign speech and its "functional equivalent" "might not apply" to the

regulation of issue advocacy. *McConnell*, *supra*, at 206, and n. 88.

In drawing that line, the First Amendment requires us to err on the side of protecting political speech rather than suppressing it. We conclude that the speech at issue in this as-applied challenge is not the "functional equivalent" of express campaign speech. We further conclude that the interests held to justify restricting corporate campaign speech or its functional equivalent do not justify restricting issue advocacy, and accordingly we hold that BCRA §203 is unconstitutional as applied to the advertisements at issue in these cases.

I

Prior to BCRA, corporations were free under federal law to use independent expenditures to engage in political speech so long as that speech did not expressly advocate the election or defeat of a clearly identified federal candidate. See *Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.*, 479 U. S. 238, 249 (1986) (*MCFL*); *Buckley*, *supra,* at 44–45; 2 U. S. C. §§441b(a), (b)(2) (2000 ed. and Supp. IV).

BCRA significantly cut back on corporations' ability to engage in political speech. BCRA §203, at issue in these cases, makes it a crime for any labor union or incorporated entity—whether the United Steelworkers, the American Civil Liberties Union, or General Motors—to use its general treasury funds to pay for any "electioneering communication." §441b(b)(2) (2000 ed., Supp. IV). BCRA's definition of "electioneering communication" is clear and expansive. It encompasses any broadcast, cable, or satellite communication that refers to a candidate for federal office and that is aired within 30 days of a federal primary election or 60 days of a federal general election in the jurisdiction in which that candidate is running for office.

4    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of the Court

§434(f)(3)(A).[1]

Appellee Wisconsin Right to Life, Inc. (WRTL), is a nonprofit, nonstock, ideological advocacy corporation recognized by the Internal Revenue Service as tax exempt under §501(c)(4) of the Internal Revenue Code. On July 26, 2004, as part of what it calls a "grassroots lobbying campaign," Brief for Appellee 8, WRTL began broadcasting a radio advertisement entitled "Wedding." The transcript of "Wedding" reads as follows:

> "'PASTOR: And who gives this woman to be married to this man?
>
> "'BRIDE'S FATHER: Well, as father of the bride, I certainly could. But instead, I'd like to share a few tips on how to properly install drywall. Now you put the drywall up . . .
>
> "'VOICE-OVER: Sometimes it's just not fair to delay an important decision.
>
> "'But in Washington it's happening. A group of Senators is using the filibuster delay tactic to block federal judicial nominees from a simple "yes" or "no" vote. So qualified candidates don't get a chance to

_____

[1] Subparagraph (A) provides:

"(i) The term 'electioneering communication' means any broadcast, cable, or satellite communication which—

"(I)  refers to a clearly identified candidate for Federal office;

"(II)  is made within—

"(aa)  60 days before a general, special, or runoff election for the office sought by the candidate; or

"(bb)  30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and

"(III)  in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate." 2 U. S. C. §434(f)(3)(A) (2000 ed., Supp. IV).

Subsection (B) defines exceptions to "electioneering communication" not relevant to this litigation. Subsection (C) defines the term "targeted to the relevant electorate."

serve.

　　"'It's politics at work, causing gridlock and backing up some of our courts to a state of emergency.

　　"'Contact Senators Feingold and Kohl and tell them to oppose the filibuster.

　　"'Visit: BeFair.org

　　"'Paid for by Wisconsin Right to Life (befair.org), which is responsible for the content of this advertising and not authorized by any candidate or candidate's committee.'"　466 F. Supp. 2d 195, 198, n. 3 (DC 2006).

On the same day, WRTL aired a similar radio ad entitled "Loan."[2]　It had also invested treasury funds in producing a television ad entitled "Waiting,"[3] which is similar in

_____

　　[2] The radio script for "Loan" differs from "Wedding" only in its lead-in. "Loan" begins:

　　"'LOAN OFFICER: Welcome Mr. and Mrs. Shulman.　We've reviewed your loan application, along with your credit report, the appraisal on the house, the inspections, and well . . .

　　"'COUPLE: Yes, yes . . . we're listening.

　　"'OFFICER: Well, it all reminds me of a time I went fishing with my father.　We were on the Wolf River Waupaca . . .

　　"'VOICE-OVER: Sometimes it's just not fair to delay an important decision.

　　"'But in Washington it's happening. . . .'"　466 F. Supp. 2d, at 198, n. 4.

The remainder of the script is identical to "Wedding."

　　[3] In "Waiting," the images on the television ad depict a "'middle-aged man being as productive as possible while his professional life is in limbo.'"　*Id.,* at 198, n. 5.　The man reads the morning paper, polishes his shoes, scans through his Rolodex, and does other similar activities. The television script for this ad reads:

　　"'VOICE-OVER: There are a lot of judicial nominees out there who can't go to work.　Their careers are put on hold because a group of Senators is filibustering—blocking qualified nominees from a simple "yes" or "no" vote.

　　"'It's politics at work and it's causing gridlock. . . .'"　*Ibid.*

The remainder of the script is virtually identical to "Wedding."

6    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of the Court

substance and format to "Wedding" and "Loan."

WRTL planned on running "Wedding," "Waiting," and "Loan" throughout August 2004 and financing the ads with funds from its general treasury. It recognized, however, that as of August 15, 30 days prior to the Wisconsin primary, the ads would be illegal "electioneering communication[s]" under BCRA §203.

Believing that it nonetheless possessed a First Amendment right to broadcast these ads, WRTL filed suit against the Federal Election Commission (FEC) on July 28, 2004, seeking declaratory and injunctive relief before a three-judge District Court. See note following 2 U. S. C. §437h (2000 ed., Supp. IV); 28 U. S. C. §2284. WRTL alleged that BCRA's prohibition on the use of corporate treasury funds for "electioneering communication[s]" as defined in the Act is unconstitutional as applied to "Wedding," "Loan," and "Waiting," as well as any materially similar ads it might seek to run in the future.

Just before the BCRA blackout period was to begin, the District Court denied a preliminary injunction, concluding that "the reasoning of the *McConnell* Court leaves no room for the kind of 'as applied' challenge WRTL propounds before us." App. to Juris. Statement 52a. In response to this ruling, WRTL did not run its ads during the blackout period. The District Court subsequently dismissed WRTL's complaint. See *id.,* at 47a–48a ("WRTL's 'as-applied' challenge to BCRA [§203] is foreclosed by the Supreme Court's decision in *McConnell*"). On appeal, we vacated the District Court's judgment, holding that *McConnell* "did not purport to resolve future as-applied challenges" to BCRA §203, and remanded "for the District Court to consider the merits of WRTL's as-applied challenge in the first instance." *WRTL I*, 546 U. S., at 412.

On remand, after allowing four Members of Congress to intervene as defendants, the three-judge District Court granted summary judgment for WRTL, holding BCRA

§203 unconstitutional as applied to the three advertisements WRTL planned to run during the 2004 blackout period. The District Court first found adjudication of the dispute not barred by mootness because the controversy was "'capable of repetition, yet evading review.'" 466 F. Supp. 2d, at 202. Turning to the merits, the court began by noting that under *McConnell*, BCRA could constitutionally proscribe "express advocacy"—defined as ads that expressly advocate the election or defeat of a candidate for federal office—and the "functional equivalent" of such advocacy. 466 F. Supp. 2d, at 204. Stating that it was limiting its inquiry to "language within the four corners" of the ads, *id.,* at 207, the District Court concluded that the ads were *not* express advocacy or its functional equivalent, but instead "genuine issue ads." *Id.,* at 205–208. Then, reaching a question "left open in *McConnell*," the court held that no compelling interest justified BCRA's regulation of genuine issue ads such as those WRTL sought to run. *Id.,* at 208–210.

One judge dissented, contending that the majority's "plain facial analysis of the text in WRTL's 2004 advertisements" ignored "the context in which the text was developed." *Id.,* at 210 (opinion of Roberts, J.). In that judge's view, a contextual analysis of the ads revealed "deep factual rifts between the parties concerning the purpose and intended effects of the ads" such that neither side was entitled to summary judgment. *Id.,* at 210, 211.

The FEC and intervenors filed separate notices of appeal and jurisdictional statements. We consolidated the two appeals and set the matter for briefing and argument, postponing further consideration of jurisdiction to the hearing on the merits. 549 U. S. ___ (2007).

II

Article III's "case-or-controversy requirement subsists through all stages of federal judicial proceedings . . . . [I]t

8    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of the Court

is not enough that a dispute was very much alive when suit was filed." *Lewis* v. *Continental Bank Corp.*, 494 U. S. 472, 477 (1990). Based on these principles, the FEC argues (though the intervenors do not) that these cases are moot because the 2004 election has passed and WRTL "does not assert any continuing interest in running [its three] advertisements, nor does it identify any reason to believe that a significant dispute over Senate filibusters of judicial nominees will occur in the foreseeable future." Brief for Appellant FEC 21.

As the District Court concluded, however, these cases fit comfortably within the established exception to mootness for disputes capable of repetition, yet evading review. See *Los Angeles* v. *Lyons*, 461 U. S. 95, 109 (1983); *Southern Pacific Terminal Co.* v. *ICC*, 219 U. S. 498, 515 (1911). The exception applies where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration; and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Spencer* v. *Kemna*, 523 U. S. 1, 17 (1998) (internal quotation marks and brackets omitted). Both circumstances are present here.

As the District Court found, it would be "entirely unreasonable . . . to expect that [WRTL] could have obtained complete judicial review of its claims in time for it to air its ads" during the BCRA blackout periods. 466 F. Supp. 2d, at 202. The FEC contends that the 2-year window between elections provides ample time for parties to litigate their rights before each BCRA blackout period. But groups like WRTL cannot predict what issues will be matters of public concern during a future blackout period. In these cases, WRTL had no way of knowing well in advance that it would want to run ads on judicial filibusters during the BCRA blackout period. In any event, despite BCRA's command that the cases be expedited "to the greatest possible extent," §403(a)(4), 116 Stat. 113,

note following 2 U. S. C. §437h (2000 ed., Supp. IV), *two* BCRA blackout periods have come and gone during the pendency of this action. "[A] decision allowing the desired expenditures would be an empty gesture unless it afforded appellants sufficient opportunity prior to the election date to communicate their views effectively." *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765, 774 (1978).

The second prong of the "capable of repetition" exception requires a "'reasonable expectation'" or a "'demonstrated probability'" that "the same controversy will recur involving the same complaining party." *Murphy* v. *Hunt*, 455 U. S. 478, 482 (1982) (*per curiam*). Our cases find the same controversy sufficiently likely to recur when a party has a reasonable expectation that it "will again be subjected to the alleged illegality," *Lyons*, *supra,* at 109, or "will be subject to the threat of prosecution" under the challenged law, *Bellotti*, *supra,* at 774–775 (citing *Weinstein* v. *Bradford*, 423 U. S. 147, 149 (1975) (*per curiam*)). The FEC argues that in order to prove likely recurrence of the same controversy, WRTL must establish that it will run ads in the future sharing all "the characteristics that the district court deemed legally relevant." Brief for Appellant FEC 23.

The FEC asks for too much. We have recognized that the "'capable of repetition, yet evading review' doctrine, in the context of election cases, is appropriate when there are 'as applied' challenges as well as in the more typical case involving only facial attacks." *Storer* v. *Brown*, 415 U. S. 724, 737, n. 8 (1974). Requiring repetition of every "legally relevant" characteristic of an as-applied challenge— down to the last detail—would effectively overrule this statement by making this exception unavailable for virtually all as-applied challenges. History repeats itself, but not at the level of specificity demanded by the FEC. Here, WRTL credibly claimed that it planned on running "'materially similar'" future targeted broadcast ads mentioning

10    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of ROBERTS, C. J.

a candidate within the blackout period, 466 F. Supp. 2d, at 197, and there is no reason to believe that the FEC will "refrain from prosecuting violations" of BCRA, *Bellotti*, *supra,* at 775. Under the circumstances, particularly where WRTL sought another preliminary injunction based on an ad it planned to run during the 2006 blackout period, see 466 F. Supp. 2d, at 203, n. 15, we hold that there exists a reasonable expectation that the same controversy involving the same party will recur. We have jurisdiction to decide these cases.

## III

WRTL rightly concedes that its ads are prohibited by BCRA §203. Each ad clearly identifies Senator Feingold, who was running (unopposed) in the Wisconsin Democratic primary on September 14, 2004, and each ad would have been "targeted to the relevant electorate," see 2 U. S. C. §434(f)(3)(C) (2000 ed., Supp. IV), during the BCRA blackout period. WRTL further concedes that its ads do not fit under any of BCRA's exceptions to the term "electioneering communication." See §434(f)(3)(B). The only question, then, is whether it is consistent with the First Amendment for BCRA §203 to prohibit WRTL from running these three ads.

## A

Appellants contend that WRTL should be required to demonstrate that BCRA is unconstitutional as applied to the ads. Reply Brief for Appellant Sen. John McCain et al. in No. 06–970, p. 5, n. 4; Brief for Appellant FEC 34. After all, appellants reason, *McConnell* already held that BCRA §203 was facially valid. These cases, however, present the separate question whether §203 may constitutionally be applied to these specific ads. Because BCRA §203 burdens political speech, it is subject to strict scrutiny. See *McConnell*, 540 U. S., at 205; *Austin* v. *Michigan Chamber*

*of Commerce*, 494 U. S. 652, 658 (1990); *MCFL*, 479 U. S., at 252 (plurality opinion); *Bellotti*, *supra,* at 786; *Buckley*, 424 U. S., at 44–45. Under strict scrutiny, the *Government* must prove that applying BCRA to WRTL's ads furthers a compelling interest and is narrowly tailored to achieve that interest. See *Bellotti*, *supra,* at 786 ("Especially where, as here, a prohibition is directed at speech itself, and the speech is intimately related to the process of governing, . . . 'the burden is on the government to show the existence of [a compelling] interest'" (footnote omitted)).

The strict scrutiny analysis is, of course, informed by our precedents. This Court has already ruled that BCRA survives strict scrutiny to the extent it regulates express advocacy or its functional equivalent. *McConnell*, *supra,* at 206. So to the extent the ads in these cases fit this description, the FEC's burden is not onerous; all it need do is point to *McConnell* and explain why it applies here. If, on the other hand, WRTL's ads are *not* express advocacy or its equivalent, the Government's task is more formidable. It must then demonstrate that banning such ads during the blackout periods is narrowly tailored to serve a compelling interest. No precedent of this Court has yet reached that conclusion.

B

The FEC, intervenors, and the dissent below contend that *McConnell* already established the constitutional test for determining if an ad is the functional equivalent of express advocacy: whether the ad is intended to influence elections and has that effect. See, *e.g.,* 466 F. Supp. 2d, at 214 (opinion of Roberts, J.). Here is the relevant portion of our opinion in *McConnell*:

> "[P]laintiffs argue that the justifications that adequately support the regulation of express advocacy do not apply to significant quantities of speech encom-

12    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of ROBERTS, C. J.

passed by the definition of electioneering communications.

"This argument fails to the extent that the issue ads broadcast during the 30- and 60-day periods preceding federal primary and general elections are the functional equivalent of express advocacy. The justifications for the regulation of express advocacy apply equally to ads aired during those periods if the ads are intended to influence the voters' decisions and have that effect." 540 U. S., at 205–206.

WRTL and the District Court majority, on the other hand, claim that *McConnell* did not adopt any test as the standard for future as-applied challenges. We agree. *McConnell*'s analysis was grounded in the evidentiary record before the Court. Two key studies in the *McConnell* record constituted "the central piece of evidence marshaled by defenders of BCRA's electioneering communication provisions in support of their constitutional validity." *McConnell* v. *FEC*, 251 F. Supp. 2d 176, 307, 308 (DC 2003) (opinion of Henderson, J.) (internal quotation marks and brackets omitted). Those studies asked "student coders" to separate ads based on whether the students thought the "purpose" of the ad was "to provide information about or urge action on a bill or issue," or "to generate support or opposition for a particular candidate." *Id.,* at 308–309 (internal quotation marks omitted; emphasis deleted); see Brief for Appellee 38. The studies concluded "'that BCRA's definition of Electioneering Communications accurately captures those ads that *have the purpose or effect of supporting candidates for election to office.*" *Ibid.* (emphasis in original).

When the *McConnell* Court considered the possible facial overbreadth of §203, it looked to the studies in the record analyzing ads broadcast during the blackout periods, and those studies had classified the ads in terms of

intent and effect. The Court's assessment was accordingly phrased in the same terms, which the Court regarded as sufficient to conclude, on the record before it, that the plaintiffs had not "carried their heavy burden of proving" that §203 was facially overbroad and could not be enforced in *any* circumstances. 540 U. S., at 207. The Court did not explain that it was adopting a particular test for determining what constituted the "functional equivalent" of express advocacy. The fact that the student coders who helped develop the evidentiary record before the Court in *McConnell* looked to intent and effect in doing so, and that the Court dealt with the record on that basis in deciding the facial overbreadth claim, neither compels nor warrants accepting that same standard as the constitutional test for separating, in an as-applied challenge, political speech protected under the First Amendment from that which may be banned.[4]

More importantly, this Court in *Buckley* had already rejected an intent-and-effect test for distinguishing between discussions of issues and candidates. See 424 U. S., at 43–44. After noting the difficulty of distinguishing between discussion of issues on the one hand and advocacy of election or defeat of candidates on the other, the *Buckley* Court explained that analyzing the question in terms "'of intent and of effect'" would afford "'no security for free

—————

[4] This is particularly true given that the methodology, data, and conclusions of the two studies were the subject of serious dispute among the District Court judges. Compare *McConnell* v. *FEC*, 251 F. Supp. 2d 176, 307–312 (DC 2003) (opinion of Henderson, J.) (stating that the studies were flawed and of limited evidentiary value), with *id.,* at 585, 583–588 (opinion of Kollar-Kotelly, J.) (finding the studies generally credible, but stating that "I am troubled by the fact that coders in both studies were asked questions regarding their own perceptions of the advertisements' purposes, and that [some of] these perceptions were later recoded" by study supervisors). Nothing in this Court's opinion in *McConnell* suggests it was resolving the sharp disagreements about the evidentiary record in this respect.

14    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of ROBERTS, C. J.

discussion.'"  *Id.,* at 43 (quoting *Thomas* v. *Collins*, 323 U. S. 516, 535 (1945)).  It therefore rejected such an approach, and *McConnell* did not purport to overrule *Buckley* on this point—or even address what *Buckley* had to say on the subject.

For the reasons regarded as sufficient in *Buckley*, we decline to adopt a test for as-applied challenges turning on the speaker's intent to affect an election.  The test to distinguish constitutionally protected political speech from speech that BCRA may proscribe should provide a safe harbor for those who wish to exercise First Amendment rights.  The test should also "reflec[t] our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Buckley*, *supra,* at 14 (quoting *New York Times Co.* v. *Sullivan*, 376 U. S. 254, 270 (1964)).  A test turning on the intent of the speaker does not remotely fit the bill.

Far from serving the values the First Amendment is meant to protect, an intent-based test would chill core political speech by opening the door to a trial on every ad within the terms of §203, on the theory that the speaker actually intended to affect an election, no matter how compelling the indications that the ad concerned a pending legislative or policy issue.  No reasonable speaker would choose to run an ad covered by BCRA if its only defense to a criminal prosecution would be that its motives were pure.  An intent-based standard "blankets with uncertainty whatever may be said," and "offers no security for free discussion." *Buckley*, *supra,* at 43 (internal quotation marks omitted).  The FEC does not disagree.  In its brief filed in the first appeal in this litigation, it argued that a "constitutional standard that turned on the subjective sincerity of a speaker's message would likely be incapable of workable application; at a minimum, it would invite costly, fact-dependent litigation."  Brief for Appellee

in *WRTL I*, O. T. 2005, No. 04–1581, p. 39.[5]

A test focused on the speaker's intent could lead to the bizarre result that identical ads aired at the same time could be protected speech for one speaker, while leading to criminal penalties for another. See M. Redish, Money Talks: Speech, Economic Power, and the Values of Democracy 91 (2001) ("[U]nder well-accepted First Amendment doctrine, a speaker's motivation is entirely irrelevant to the question of constitutional protection"). "First Amendment freedoms need breathing space to survive." *NAACP* v. *Button*, 371 U. S. 415, 433 (1963). An intent test provides none.

*Buckley* also explains the flaws of a test based on the actual effect speech will have on an election or on a particular segment of the target audience. Such a test "'puts the speaker . . . wholly at the mercy of the varied understanding of his hearers.'" 424 U. S., at 43. It would also typically lead to a burdensome, expert-driven inquiry, with an indeterminate result. Litigation on such a standard may or may not accurately predict electoral effects, but it will unquestionably chill a substantial amount of political speech.

C

"The freedom of speech . . . guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment." *Bellotti*, 435 U. S., at 776 (internal quotation marks omitted). See

---

[5] Consider what happened in these cases. The District Court permitted extensive discovery on the assumption that WRTL's intent was relevant. As a result, the defendants deposed WRTL's executive director, its legislative director, its political action committee director, its lead communications consultant, and one of its fundraisers. WRTL also had to turn over many documents related to its operations, plans, and finances. Such litigation constitutes a severe burden on political speech.

16  FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of ROBERTS, C. J.

*Consolidated Edison Co. of N. Y.* v. *Public Serv. Comm'n of
N. Y.*, 447 U. S. 530, 534 (1980). To safeguard this liberty,
the proper standard for an as-applied challenge to BCRA
§203 must be objective, focusing on the substance of the
communication rather than amorphous considerations of
intent and effect. See *Buckley*, *supra,* at 43–44. It must
entail minimal if any discovery, to allow parties to resolve
disputes quickly without chilling speech through the
threat of burdensome litigation. See *Virginia* v. *Hicks*,
539 U. S. 113, 119 (2003). And it must eschew "the open-
ended rough-and-tumble of factors," which "invit[es] com-
plex argument in a trial court and a virtually inevitable
appeal." *Jerome B. Grubart, Inc.* v. *Great Lakes Dredge &
Dock Co.*, 513 U. S. 527, 547 (1995). In short, it must give
the benefit of any doubt to protecting rather than stifling
speech. See *New York Times Co.* v. *Sullivan*, *supra,* at
269–270.

In light of these considerations, a court should find that
an ad is the functional equivalent of express advocacy only
if the ad is susceptible of no reasonable interpretation
other than as an appeal to vote for or against a specific
candidate. Under this test, WRTL's three ads are plainly
not the functional equivalent of express advocacy. First,
their content is consistent with that of a genuine issue ad:
The ads focus on a legislative issue, take a position on the
issue, exhort the public to adopt that position, and urge
the public to contact public officials with respect to the
matter. Second, their content lacks indicia of express
advocacy: The ads do not mention an election, candidacy,
political party, or challenger; and they do not take a posi-
tion on a candidate's character, qualifications, or fitness
for office.

Despite these characteristics, appellants assert that the
content of WRTL's ads alone betrays their electioneering
nature. Indeed, the FEC suggests that *any* ad covered by
§203 that includes "an appeal to citizens to contact their

elected representative" is the "functional equivalent" of an ad saying defeat or elect that candidate. Brief for Appellant FEC 31; see Brief for Appellant Sen. John McCain et al. in No. 06–970, pp. 21–23 (hereinafter McCain Brief). We do not agree. To take just one example, during a blackout period the House considered the proposed Universal National Service Act. See App. to Brief for American Center for Law and Justice et al. as *Amicus Curiae* B–3. There would be no reason to regard an ad supporting or opposing that Act, and urging citizens to contact their Representative about it, as the equivalent of an ad saying vote for or against the Representative. Issue advocacy conveys information and educates. An issue ad's impact on an election, if it exists at all, will come only after the voters hear the information and choose—uninvited by the ad—to factor it into their voting decisions.[6]

The FEC and intervenors try to turn this difference to their advantage, citing *McConnell*'s statements "that the

_____

[6] For these reasons, we cannot agree with JUSTICE SOUTER's assertion that "anyone who heard the Feingold ads . . . would know that WRTL's message was to vote against Feingold." *Post,* at 23. The dissent supports this assertion by likening WRTL's ads to the "Jane Doe" example identified in *McConnell* v. *Federal Election Comm'n,* 540 U. S. 93 (2003). But that ad "condemned Jane Doe's record on a particular issue." *Post,* at 23 (internal quotation marks omitted). WRTL's ads do not do so; they instead take a position on the filibuster issue and exhort constituents to contact Senators Feingold and Kohl to advance that position. Indeed, one would not even know from the ads whether Senator Feingold supported or opposed filibusters. JUSTICE SOUTER is confident Wisconsinites independently knew Senator Feingold's position on filibusters, but we think that confidence misplaced. A prominent study found, for example, that during the 2000 election cycle, 85 percent of respondents to a survey were not even able to name at least one candidate for the House of Representatives in their own district. See Inter-university Consortium for Political and Social Research, American National Election Study, 2000: Pre- and Post-Election Survey 243 (N. Burns et al. eds. 2002) online at http://www.icpsr.umich.edu/cocoon/ICPSR/STUDY/03131.xml (as visited June 22, 2007, and available in Clerk of Court's case file).

18    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of ROBERTS, C. J.

most effective campaign ads, like the most effective commercials for products . . . avoid the [*Buckley*] magic words [expressly advocating the election or defeat of a candidate]," 540 U. S., at 127, and that advertisers "would seldom choose to use such words even if permitted," *id.,* at 193. See McCain Brief 19. An expert for the FEC in these cases relied on those observations to argue that WRTL's ads are especially effective electioneering ads because they are "subtl[e]," focusing on issues rather than simply exhorting the electorate to vote against Senator Feingold. App. 56–57. Rephrased a bit, the argument perversely maintains that the *less* an issue ad resembles express advocacy, the more likely it is to be the functional equivalent of express advocacy. This "heads I win, tails you lose" approach cannot be correct. It would effectively eliminate First Amendment protection for genuine issue ads, contrary to our conclusion in *WRTL I* that as-applied challenges to §203 are available, and our assumption in *McConnell* that "the interests that justify the regulation of campaign speech might not apply to the regulation of genuine issue ads," 540 U. S., at 206, n. 88. Under appellants' view, there can be no such thing as a genuine issue ad during the blackout period—it is simply a very effective electioneering ad.

Looking beyond the content of WRTL's ads, the FEC and intervenors argue that several "contextual" factors prove that the ads are the equivalent of express advocacy. First, appellants cite evidence that during the same election cycle, WRTL and its Political Action Committee (PAC) actively opposed Senator Feingold's reelection and identified filibusters as a campaign issue. This evidence goes to WRTL's subjective intent in running the ads, and we have already explained that WRTL's intent is irrelevant in an as-applied challenge. Evidence of this sort is therefore beside the point, as it should be—WRTL does not forfeit its right to speak on issues simply because in other aspects

of its work it also opposes candidates who are involved with those issues.

Next, the FEC and intervenors seize on the timing of WRTL's ads. They observe that the ads were to be aired near elections but not near actual Senate votes on judicial nominees, and that WRTL did not run the ads after the elections. To the extent this evidence goes to WRTL's subjective intent, it is again irrelevant. To the extent it nonetheless suggests that the ads should be interpreted as express advocacy, it falls short. That the ads were run close to an election is unremarkable in a challenge like this. *Every* ad covered by BCRA §203 will by definition air just before a primary or general election. If this were enough to prove that an ad is the functional equivalent of express advocacy, then BCRA would be constitutional in all of its applications. This Court unanimously rejected this contention in *WRTL I.*

That the ads were run shortly after the Senate had recessed is likewise unpersuasive. Members of Congress often return to their districts during recess, precisely to determine the views of their constituents; an ad run at that time may succeed in getting more constituents to contact the Representative while he or she is back home. In any event, a group can certainly choose to run an issue ad to coincide with public interest rather than a floor vote. Finally, WRTL did not resume running its ads after the BCRA blackout period because, as it explains, the debate had changed. Brief for Appellee 16. The focus of the Senate was on whether a majority would vote to change the Senate rules to eliminate the filibuster—not whether individual Senators would continue filibustering. Given this change, WRTL's decision not to continue running its ads after the blackout period does not support an inference that the ads were the functional equivalent of electioneering.

The last piece of contextual evidence the FEC and inter-

20   FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of ROBERTS, C. J.

venors highlight is the ads' "specific and repeated cross-reference" to a website. Reply Brief for Appellant FEC 15. In the middle of the website's homepage, in large type, were the addresses, phone numbers, fax numbers, and email addresses of Senators Feingold and Kohl. Wisconsinites who viewed "Wedding," "Loan," or "Waiting" and wished to contact their Senators—as the ads requested—would be able to obtain the pertinent contact information immediately upon visiting the website. This is fully consistent with viewing WRTL's ads as genuine issue ads. The website also stated both Wisconsin Senators' positions on judicial filibusters, and allowed visitors to sign up for "e-alerts," some of which contained exhortations to vote against Senator Feingold. These details lend the electioneering interpretation of the ads more credence, but again, WRTL's participation in express advocacy in other aspects of its work is not a justification for censoring its issue-related speech. Any express advocacy on the website, already one step removed from the text of the ads themselves, certainly does not render an interpretation of the ads as genuine issue ads unreasonable.

Given the standard we have adopted for determining whether an ad is the "functional equivalent" of express advocacy, contextual factors of the sort invoked by appellants should seldom play a significant role in the inquiry. Courts need not ignore basic background information that may be necessary to put an ad in context—such as whether an ad "describes a legislative issue that is either currently the subject of legislative scrutiny or likely to be the subject of such scrutiny in the near future," 466 F. Supp. 2d, at 207—but the need to consider such background should not become an excuse for discovery or a broader inquiry of the sort we have just noted raises First Amendment concerns.

At best, appellants have shown what we have acknowledged at least since *Buckley*: that "the distinction between

discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application." 424 U. S., at 42. Under the test set forth above, that is not enough to establish that the ads can only reasonably be viewed as advocating or opposing a candidate in a federal election. "Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill* v. *Alabama*, 310 U. S. 88, 102 (1940). Discussion of issues cannot be suppressed simply because the issues may also be pertinent in an election. Where the First Amendment is implicated, the tie goes to the speaker, not the censor.[7]

_____

[7] JUSTICE SCALIA thinks our test impermissibly vague. See *post*, at 11–12 (opinion concurring in part and concurring in judgment). As should be evident, we agree with JUSTICE SCALIA on the imperative for clarity in this area; that is why our test affords protection unless an ad is susceptible of *no reasonable interpretation* other than as an appeal to vote for or against a specific candidate. It is why we emphasize that (1) there can be no free-ranging intent-and-effect test; (2) there generally should be no discovery or inquiry into the sort of "contextual" factors highlighted by the FEC and intervenors; (3) discussion of issues cannot be banned merely because the issues might be relevant to an election; and (4) in a debatable case, the tie is resolved in favor of protecting speech. And keep in mind this test is only triggered if the speech meets the brightline requirements of BCRA §203 in the first place. JUSTICE SCALIA's criticism of our test is all the more confusing because he accepts WRTL's proposed three-prong test as "clear." *Post,* at 17. We do not think our test any vaguer than WRTL's, and it is more protective of political speech.

JUSTICE SCALIA also asserts that our test conflicts with *Buckley* v. *Valeo,* 424 U. S. 1 (1976) (*per curiam*). *Post,* at 13–16. The *Buckley* Court confronted a statute restricting "any expenditure . . . relative to a clearly identified candidate." 424 U. S., at 42 (internal quotation marks omitted). To avoid vagueness concerns, this Court first narrowed the statute to cover only expenditures expressly "advocating the election or defeat of a candidate"—using the so-called "magic words" of express advocacy. *Ibid.* (internal quotation marks omitted). The Court then

22    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of ROBERTS, C. J.

We confronted a similar issue in *Ashcroft* v. *Free Speech Coalition*, 535 U. S. 234 (2002), in which the Government argued that virtual images of child pornography were difficult to distinguish from real images. The Government's solution was "to prohibit both kinds of images." *Id.,* at 254–255. We rejected the argument that "protected speech may be banned as a means to ban unprotected speech," concluding that it "turns the First Amendment upside down." *Id.,* at 255. As we explained: "The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse." *Ibid.*

Because WRTL's ads may reasonably be interpreted as something other than as an appeal to vote for or against a specific candidate, we hold they are not the functional equivalent of express advocacy, and therefore fall outside the scope of *McConnell*'s holding.[8]

---

proceeded to strike down the newly narrowed statute under strict scrutiny on the ground that its reach was not broad enough. *Id.*, at 44. From this, JUSTICE SCALIA concludes that "[i]f a permissible test short of the magic-words test existed, *Buckley* would surely have adopted it." *Post*, at 14. We are not so sure. The question in *Buckley* was how a particular statutory provision could be construed to avoid vagueness concerns, not what the constitutional standard for clarity was in the abstract, divorced from specific statutory language. *Buckley*'s intermediate step of statutory construction on the way to its constitutional holding does not dictate a constitutional test. The *Buckley* Court's "express advocacy restriction was an endpoint of statutory interpretation, not a first principle of constitutional law." *McConnell*, 540 U. S., at 190. And despite JUSTICE SCALIA's claim to the contrary, our citation of *Buckley* along with other decisions in rejecting an intent-and-effect test does not force us to adopt (or reject) *Buckley*'s statutory construction as a constitutional test.

[8] Nothing in *McConnell*'s statement that the "vast majority" of issue ads broadcast in the periods preceding federal elections had an "electioneering purpose" forecloses this conclusion. 540 U. S., at 206. Courts do not resolve unspecified as-applied challenges in the course of resolving a facial attack, so *McConnell* could not have settled the issue

## IV

BCRA §203 can be constitutionally applied to WRTL's ads only if it is narrowly tailored to further a compelling interest. *McConnell*, 540 U. S*.,* at 205; *Bellotti*, 435 U. S., at 786; *Buckley*, *supra,* at 44–45. This Court has never recognized a compelling interest in regulating ads, like WRTL's, that are neither express advocacy nor its functional equivalent. The District Court below considered interests that might justify regulating WRTL's ads here, and found none sufficiently compelling. 466 F. Supp. 2d, at 208–210. We reach the same conclusion.[9]

————

we address today. See *Members of City Council of Los Angeles* v. *Taxpayers for Vincent*, 466 U. S. 789, 803, n. 22 (1984) ("The fact that [a law] is capable of valid applications does not necessarily mean that it is valid as applied to these litigants"). Indeed, *WRTL I* confirmed as much. 546 U. S., at 411–412. By the same token, in deciding this as-applied challenge, we have no occasion to revisit *McConnell*'s conclusion that the statute is not facially overbroad.

The "vast majority" language, moreover, is beside the point. The *McConnell* Court did not find that a "vast majority" of the issue ads considered were the functional equivalent of direct advocacy. Rather, it found that such ads had an "electioneering purpose." For the reasons we have explained, "purpose" is not the appropriate test for distinguishing between genuine issue ads and the functional equivalent of express campaign advocacy. See *supra*, at 14–15. In addition, the "vast majority" statement was not necessary to the Court's facial holding in *McConnell*. The standard required for a statute to survive an over-breadth challenge is not that the "vast majority" of a statute's applications be legitimate. "[B]road language . . . unnecessary to the Court's decision . . . cannot be considered binding authority." *Kastigar* v. *United States*, 406 U. S. 441, 454–455 (1972).

[9] The dissent stresses a number of points that, while not central to our decision, nevertheless merit a response. First, the dissent over-states its case when it asserts that the "PAC alternative" gives corporations a constitutionally sufficient outlet to speak. See *post,* at 30. PACs impose well-documented and onerous burdens, particularly on small nonprofits. See *MCFL*, 479 U. S. 238, 253–255 (1986) (plurality opinion). *McConnell* did conclude that segregated funds "provid[e] corporations and unions with a constitutionally sufficient opportunity to engage in express advocacy" and its functional equivalent, 540 U. S., at

24    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of ROBERTS, C. J.

At the outset, we reject the contention that issue advocacy may be regulated because express election advocacy may be, and "the speech involved in so-called issue advocacy is [not] any more core political speech than are words of express advocacy." *McConnell, supra,* at 205.  This greater-includes-the-lesser approach is not how strict scrutiny works.  A corporate ad expressing support for the local football team could not be regulated on the ground that such speech is less "core" than corporate speech about an election, which we have held may be restricted.  A court applying strict scrutiny must ensure that a compelling interest supports *each application* of a statute restricting speech.  That a compelling interest justifies restrictions on express advocacy tells us little about whether a compelling interest justifies restrictions on issue advocacy; the *McConnell* Court itself made just that point.  See 540

---

203, but that holding did not extend beyond functional equivalents—and if it did, the PAC option would justify regulation of all corporate speech, a proposition we have rejected, see *Bellotti*, 435 U. S., at 777–778.  Second, the response that a speaker should just take out a newspaper ad, or use a website, rather than complain that it cannot speak through a broadcast communication, see *post,* at 18–19, 33, is too glib.  Even assuming for the sake of argument that the possibility of using a different medium of communication has relevance in determining the permissibility of a limitation on speech, newspaper ads and websites are not reasonable alternatives to broadcast speech in terms of impact and effectiveness.  See *McConnell* v. *FEC*, 251 F. Supp. 2d, at 569–573, 646 (Kollar-Kotelly, J.).  Third, we disagree with the dissent's view that corporations can still speak by changing what they say to avoid mentioning candidates, *post,* at 30–31.  That argument is akin to telling Cohen that he cannot wear his jacket because he is free to wear one that says "I disagree with the draft," cf. *Cohen* v. *California*, 403 U. S. 15 (1971), or telling 44 Liquormart that it can advertise so long as it avoids mentioning prices, cf. *44 Liquormart, Inc.* v. *Rhode Island*, 517 U. S. 484 (1996).  Such notions run afoul of "the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message."  *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U. S. 557, 573 (1995).

U. S., at 206, n. 88.  Such a greater-includes-the-lesser argument would dictate that virtually *all* corporate speech can be suppressed, since few kinds of speech can lay claim to being as central to the First Amendment as campaign speech.  That conclusion is clearly foreclosed by our precedent.  See, *e.g., Bellotti*, *supra,* at 776–777.

This Court has long recognized "the governmental interest in preventing corruption and the appearance of corruption" in election campaigns.  *Buckley*, 424 U. S., at 45.  This interest has been invoked as a reason for upholding *contribution* limits.  As *Buckley* explained, "[t]o the extent that large contributions are given to secure a political *quid pro quo* from current and potential office holders, the integrity of our system of representative democracy is undermined."  *Id.,* at 26–27.  We have suggested that this interest might also justify limits on electioneering *expenditures* because it may be that, in some circumstances, "large independent expenditures pose the same dangers of actual or apparent *quid pro quo* arrangements as do large contributions."  *Id.,* at 45.

*McConnell* arguably applied this interest—which this Court had only assumed could justify regulation of express advocacy—to ads that were the "functional equivalent" of express advocacy.  See 540 U. S., at 204–206.  But to justify regulation of WRTL's ads, this interest must be stretched yet another step to ads that are *not* the functional equivalent of express advocacy.  Enough is enough.  Issue ads like WRTL's are by no means equivalent to contributions, and the *quid-pro-quo* corruption interest cannot justify regulating them.  To equate WRTL's ads with contributions is to ignore their value as political speech.

Appellants argue that an expansive definition of "functional equivalent" is needed to ensure that issue advocacy does not circumvent the rule against express advocacy, which in turn helps protect against circumvention of the

26    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of ROBERTS, C. J.

rule against contributions.  Cf. *McConnell, supra,* at 205
("[R]ecent cases have recognized that certain restrictions
on corporate electoral involvement permissibly hedge
against circumvention of [valid] contribution limits" (in-
ternal quotation marks omitted; brackets in original)).
But such a prophylaxis-upon-prophylaxis approach to
regulating expression is not consistent with strict scru-
tiny.  "[T]he desire for a bright-line rule . . . hardly consti-
tutes the *compelling* state interest necessary to justify any
infringement on First Amendment freedom."  *MCFL*, 479
U. S., at 263.  See *Free Speech Coalition*, 535 U. S., at 255
("The Government may not suppress lawful speech as the
means to suppress unlawful speech"); *Buckley*, *supra,* at
44 (expenditure limitations "cannot be sustained simply by
invoking the interest in maximizing the effectiveness of
the less intrusive contribution limitations").

A second possible compelling interest recognized by this
Court lies in addressing a "different type of corruption in
the political arena: the corrosive and distorting effects of
immense aggregations of wealth that are accumulated
with the help of the corporate form and that have little or
no correlation to the public's support for the corporation's
political ideas." *Austin*, 494 U. S., at 660.  *Austin* invoked
this interest to uphold a state statute making it a felony
for corporations to use treasury funds for independent
expenditures on express election advocacy.  *Id.,* at 654–
655.  *McConnell* also relied on this interest in upholding
regulation not just of express advocacy, but also its "func-
tional equivalent."  540 U. S., at 205–206.

These cases did not suggest, however, that the interest
in combating "a different type of corruption" extended
beyond campaign speech.  Quite the contrary.  Two of the
Justices who joined the 6-to-3 majority in *Austin* relied, in
upholding the constitutionality of the ban on campaign
speech, on the fact that corporations retained freedom to
speak on issues as distinct from election campaigns.  See

494 U. S., at 675–678 (Brennan, J., concurring) (describing fact that campaign speech ban "does not regulate corporate expenditures in referenda or other corporate expression" as "reflect[ing] the requirements of our decisions"); *id.,* at 678 (STEVENS, J., concurring) ("[T]here is a vast difference between lobbying and debating public issues on the one hand, and political campaigns for election to public office on the other"). The *McConnell* Court similarly was willing to "assume that the interests that justify the regulation of campaign speech might not apply to the regulation of genuine issue ads." 540 U. S., at 206, n. 88. And our decision in *WRTL I* reinforced the validity of that assumption by holding that BCRA §203 is susceptible to as-applied challenges. 546 U. S., at 411–412.

Accepting the notion that a ban on campaign speech could also embrace issue advocacy would call into question our holding in *Bellotti* that the corporate identity of a speaker does not strip corporations of all free speech rights. 435 U. S., at 778. It would be a constitutional "bait and switch" to conclude that corporate campaign speech may be banned in part *because* corporate issue advocacy is not, and then assert that corporate issue advocacy may be banned as well, pursuant to the same asserted compelling interest, through a broad conception of what constitutes the functional equivalent of campaign speech, or by relying on the inability to distinguish campaign speech from issue advocacy.

The FEC and intervenors do not argue that the *Austin* interest justifies regulating genuine issue ads. Instead, they focus on establishing that WRTL's ads are the functional equivalent of express advocacy—a contention we have already rejected. We hold that the interest recognized in *Austin* as justifying regulation of corporate campaign speech and extended in *McConnell* to the functional equivalent of such speech has no application to issue

28 FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of ROBERTS, C. J.

advocacy of the sort engaged in by WRTL.[10]

Because WRTL's ads are not express advocacy or its functional equivalent, and because appellants identify no interest sufficiently compelling to justify burdening WRTL's speech, we hold that BCRA §203 is unconstitutional as applied to WRTL's "Wedding," "Loan," and "Waiting" ads.

\* \* \*

These cases are about political speech. The importance of the cases to speech and debate on public policy issues is reflected in the number of diverse organizations that have joined in supporting WRTL before this Court: the American Civil Liberties Union, the National Rifle Association, the American Federation of Labor and Congress of Industrial Organizations, the Chamber of Commerce of the United States of America, Focus on the Family, the Coalition of Public Charities, the Cato Institute, and many others.

Yet, as is often the case in this Court's First Amendment opinions, we have gotten this far in the analysis without quoting the Amendment itself: "Congress shall make no law . . . abridging the freedom of speech." The

---

[10] The interest recognized in *Austin* stems from a concern that "'[t]he resources in the treasury of a business corporation . . . are not an indication of popular support for the corporation's political ideas.'" *Austin* v. *Michigan Chamber of Commerce*, 494 U. S. 652, 659 (1990) (alteration in original). Some of WRTL's *amici* contend that this interest is not implicated here because of WRTL's status as a nonprofit advocacy organization. They assert that "[s]peech by nonprofit advocacy groups on behalf of their members does not 'corrupt' candidates or 'distort' the political marketplace," and that "[n]onprofit advocacy groups funded by individuals are readily distinguished from for-profit corporations funded by general treasuries." Brief for Family Research Council et al. as *Amici Curiae* 3, 4. Cf. *MCFL,* 479 U. S., at 264. We do not pass on this argument in this as-applied challenge because WRTL's funds for its ads were not derived solely from individual contributions. See Brief for Appellant FEC 11.

Framers' actual words put these cases in proper perspective. Our jurisprudence over the past 216 years has rejected an absolutist interpretation of those words, but when it comes to drawing difficult lines in the area of pure political speech—between what is protected and what the Government may ban—it is worth recalling the language we are applying. *McConnell* held that express advocacy of a candidate or his opponent by a corporation shortly before an election may be prohibited, along with the functional equivalent of such express advocacy. We have no occasion to revisit that determination today. But when it comes to defining what speech qualifies as the functional equivalent of express advocacy subject to such a ban—the issue we *do* have to decide—we give the benefit of the doubt to speech, not censorship. The First Amendment's command that "Congress shall make no law . . . abridging the freedom of speech" demands at least that.

The judgment of the United States District Court for the District of Columbia is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 06–969 and 06–970

_____

FEDERAL ELECTION COMMISSION, APPELLANT
06–969                    *v.*
WISCONSIN RIGHT TO LIFE, INC.

SENATOR JOHN MCCAIN, ET AL., APPELLANTS
06–970                    *v.*
WISCONSIN RIGHT TO LIFE, INC.

ON APPEALS FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

[June 25, 2007]

JUSTICE ALITO, concurring.

I join the principal opinion because I conclude (a) that
§203 of the Bipartisan Campaign Reform Act of 2002, 2
U. S. C. §441b(b)(2) (2000 ed., Supp. IV), as applied, can-
not constitutionally ban any advertisement that may
reasonably be interpreted as anything other than an
appeal to vote for or against a candidate, (b) that the ads
at issue here may reasonably be interpreted as something
other than such an appeal, and (c) that because §203 is
unconstitutional as applied to the advertisements before
us, it is unnecessary to go further and decide whether
§203 is unconstitutional on its face. If it turns out that the
implementation of the as-applied standard set out in the
principal opinion impermissibly chills political speech, see
*post,* at 15–16 (SCALIA, J., joined by KENNEDY, and
THOMAS, JJ., concurring in part and concurring in judg-
ment), we will presumably be asked in a future case
to reconsider the holding in *McConnell* v. *Federal
Election Comm'n*, 540 U. S. 93 (2003), that §203 is facially
constitutional.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 06–969 and 06–970

———————

FEDERAL ELECTION COMMISSION, APPELLANT
06–969                    *v.*
WISCONSIN RIGHT TO LIFE, INC.


SENATOR JOHN MCCAIN, ET AL., APPELLANTS
06–970                    *v.*
WISCONSIN RIGHT TO LIFE, INC.

ON APPEALS FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

[June 25, 2007]

JUSTICE SCALIA, with whom JUSTICE KENNEDY and JUSTICE THOMAS join, concurring in part and concurring in the judgment.

A Moroccan cartoonist once defended his criticism of the Moroccan monarch (*lèse majesté* being a serious crime in Morocco) as follows: "'I'm not a revolutionary, I'm just defending freedom of speech. . . . I never said we had to change the king—no, no, no, no!  But I said that some things the king is doing, I do not like.  Is that a crime?'"[1] Well, in the United States (making due allowance for the fact that we have elected representatives instead of a king) it *is* a crime, at least if the speaker is a union or a corporation (including not-for-profit public-interest corporations) and if the representative is identified by name within a certain period before a primary or congressional election in which he is running.  That is the import of §203 of the Bipartisan Campaign Reform Act of 2002 (BCRA),

————————

[1] Whitlock, Satirist Continues to Prove Himself a Royal Pain, Washington Post, Apr. 26, 2005, pp. C1, C8.

2    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of SCALIA, J.

the constitutionality of which we upheld three Terms ago in *McConnell* v. *Federal Election Comm'n*, 540 U. S. 93 (2003). As an element essential to that determination of constitutionality, our opinion left open the possibility that a corporation or union could establish that, in the particular circumstances of its case, the ban was unconstitutional because it was (to pursue the analogy) *only* the king's policies and not his tenure in office that was criticized. Today's cases present the question of what sort of showing is necessary for that purpose. For the reasons I set forth below, it is my view that no test for such a showing can both (1) comport with the requirement of clarity that unchilled freedom of political speech demands, and (2) be compatible with the facial validity of §203 (as pronounced in *McConnell*). I would therefore reconsider the decision that sets us the unsavory task of separating issue-speech from election-speech with no clear criterion.

I

Today's cases originated in the efforts of Wisconsin Right to Life, Inc. (WRTL), a Wisconsin nonprofit, non-stock ideological advocacy corporation, to lobby Wisconsin voters concerning the filibustering of the President's judicial nominees. The problem for WRTL was that, under §203 of BCRA, it would have been unlawful to air its television and radio ads within 30 days before the September 14, 2004, primary or within 60 days before the November 2, 2004, general election because the ads named Senator Feingold, who was then seeking reelection. Section 203(a) of BCRA amended §316(b)(2) of the Federal Election Campaign Act Amendments of 1974, which prohibited corporations and unions from "mak[ing] a contribution or expenditure in connection with any election to any political office, or in connection with any primary election . . . for any political office." 2 U. S. C. §441b(a). Prior to BCRA, that section covered only expenditures for

communications that expressly advocated the election or defeat of a candidate (in campaign-finance speak, so-called "express advocacy"). *McConnell*, *supra*, at 204. As amended, however, that section was broadened to cover "electioneering communication[s]," §441b(b)(2) (2000 ed., Supp. IV), which include "any broadcast, cable, or satellite communication" that "refers to a clearly identified candidate for Federal office" and that is aired within 60 days before a general election, or 30 days before a primary election, in the jurisdiction in which the candidate is running. §434(f)(3) (2000 ed., Supp. IV).[2] Under the new law, a corporation or union wishing to air advertisements covered by the definition of "electioneering communication" is prohibited by §203 from doing so unless it first creates a separate segregated fund run by a "political action committee," commonly known as a "PAC." §441b(b)(2)(C) (2000 ed., Supp. IV). Three Terms ago, in *McConnell*, *supra*, this Court upheld most of BCRA's provisions against constitutional challenge, including §203. The Court found that the "vast majority" of ads aired during the 30-day and 60-day periods before elections were "the functional equivalent of express advocacy," *id.*, at 206, but suggested that "pure issue ads," *id.*, at 207, or "genuine issue ads," *id.*, at 206, would be protected.

The question in these cases is whether §203 can be applied to WRTL's ads consistently with the First Amendment. Last Term, this Court unanimously held, in *Wis-*

―――――――――

[2] BCRA also includes a backup definition of "electioneering communication" that will take effect in the event the primary definition is "held to be constitutionally insufficient . . . to support the regulation provided herein." 2 U. S. C. §434(f)(3)(A)(ii) (2000 ed., Supp. IV). This defines "electioneering communication" as "any broadcast, cable, or satellite communication which promotes or supports a candidate for [a federal] office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate) and which also is suggestive of no plausible meaning other than an exhortation to vote for or against a specific candidate." *Ibid.*

4    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of SCALIA, J.

*consin Right to Life, Inc.* v. *Federal Election Comm'n*, 546 U. S. 410, 411–412 (2006) *(per curiam) (WRTL I)*, that as-applied challenges to §203 are available. The District Court in these cases subsequently held that §203 is unconstitutional as applied to the three ads at issue. The Court today affirms the judgment of the District Court. While I agree with that result, I disagree with the principal opinion's reasons.

## II

A proper explanation of my views in these cases requires some discussion of the case law leading up to *McConnell*. I begin with the seminal case of *Buckley* v. *Valeo*, 424 U. S. 1 (1976) *(per curiam)*, wherein this Court considered the constitutionality of various political contribution and expenditure limitations contained in the Federal Election Campaign Act of 1971 (FECA), 86 Stat. 3, as amended, 88 Stat. 1263. *Buckley* set forth a now-familiar framework for evaluating the constitutionality of campaign-finance regulations. The Court began with the recognition that contributing money to, and spending money on behalf of, political candidates implicates core First Amendment protections, and that restrictions on such contributions and expenditures "operate in an area of the most fundamental First Amendment activities." 424 U. S., at 14. The Court also recognized, however, that the Government has a compelling interest in "prevention of corruption and the appearance of corruption." *Id.*, at 25. The "corruption" to which the Court repeatedly referred was of the "*quid pro quo*" variety, whereby an individual or entity makes a contribution or expenditure in exchange for some action by an official. *Id.*, at 26, 27, 45, 47.

The Court then held that FECA's *contribution* limitations passed constitutional muster because they represented a "marginal restriction upon the contributor's ability to engage in free communication," *id.,* at 20–21,

and were thus subject to a lower level of scrutiny, *id.*, at 25. The Court invalidated, however, FECA's limitation on independent expenditures (*i.e.*, expenditures made to express one's own positions and not in coordination with a campaign). *Id.*, at 39–51. In the Court's view, expenditure limitations restrict speech that is "'at the core of our electoral process and of the First Amendment freedoms,'" *id.*, at 39, and require the highest scrutiny, *id.*, at 44–45.

The independent-expenditure restriction at issue in *Buckley* limited the amount of money that could be spent "'relative to a clearly identified candidate.'" *Id.*, at 41 (quoting 18 U. S. C. §608(e)(1) (1970 ed., Supp. IV) (repealed 1976)). Before striking down the expenditure limitation, the Court narrowly construed §608(e)(1), in light of vagueness concerns, to cover only express advocacy—that is, advertising that "in express terms advocate[s] the election or defeat of a clearly identified candidate for federal office" by use of such words of advocacy "as 'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote against,' 'defeat,' 'reject.'" 424 U. S., at 44, and n. 52. This narrowing construction excluded so-called "issue advocacy"—for example, an ad that refers to a clearly identified candidate's position on an issue, but does not expressly advocate his election or defeat. Even as narrowly construed to cover only express advocacy, however, §608(e)(1) was held to be unconstitutional because the narrowed prohibition was too narrow to be effective and (quite apart from that shortcoming) independent expenditures did not pose a serious enough threat of corruption. *Id.*, at 45–46. Notably, the Court also found the Government's interest in "equalizing the relative ability of individuals and groups to influence the outcome of elections" insufficient to support limitations on independent expenditures. *Id.*, at 48.

*Buckley* might well have been the last word on limitations on independent expenditures. Some argued, how-

6    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of SCALIA, J.

ever, that independent expenditures *by corporations* should be treated differently.  That argument should have been foreclosed by *Buckley* for several reasons: (1) the particular provision at issue in *Buckley*, §608(e)(1) of FECA, was directed to expenditures not just by "individuals," but by "persons," with "'persons'" specifically defined to include "'corporation[s],'" *id.,* at 23, 39, n. 45; (2) the plaintiffs in *Buckley* included corporations, *id.*, at 8; and (3) *Buckley*, *id.*, at 50–51, cited a case that involved limitations on corporations in support of its striking down the restriction at issue, *Miami Herald Publishing Co.* v. *Tornillo*, 418 U. S. 241 (1974).  Moreover, pre-*Buckley* cases had accorded corporations full First Amendment protection.  See, *e.g.*, *NAACP* v. *Button*, 371 U. S. 415, 428–429, 431 (1963) (holding that the corporation's activities were "modes of expression and association protected by the First and Fourteenth Amendments"); *Grosjean* v. *American Press Co.*, 297 U. S. 233, 244 (1936) (holding that corporations are guaranteed the "freedom of speech and of the press . . . safeguarded by the due process of law clause of the Fourteenth Amendment").  See also *Pacific Gas & Elec. Co.* v. *Public Util. Comm'n of Cal.*, 475 U. S. 1, 8 (1986) (plurality opinion) ("The identity of the speaker is not decisive in determining whether speech is protected"; "[c]orporations and other associations, like individuals, contribute to the 'discussion, debate, and the dissemination of information and ideas' that the First Amendment seeks to foster").

Indeed, one would have thought the *coup de grâce* to the argument that corporations can be treated differently for these purposes was dealt by *First Nat. Bank of Boston* v. *Bellotti*, 435 U. S. 765 (1978), decided just two years after *Buckley*.  In that case, the Court struck down a Massachusetts statute that prohibited corporations from spending money in connection with a referendum unless the referendum materially affected the corporation's property,

business, or assets. As the Court explained: The principle that such advocacy is "at the heart of the First Amendment's protection" and is "indispensable to decisionmaking in a democracy" is "no less true because the speech comes from a corporation rather than an individual." 435 U. S., at 776–777. And the Court rejected the arguments that corporate participation "would exert an undue influence on the outcome of a referendum vote"; that corporations would "drown out other points of view" and "destroy the confidence of the people in the democratic process," *id.*, at 789; and that the prohibition was needed to protect corporate shareholders "by preventing the use of corporate resources in furtherance of views with which some shareholders may disagree," *id.*, at 792–793.[3]

The Court strayed far from these principles, however, in one post-*Buckley* case: *Austin* v. *Michigan Chamber of Commerce*, 494 U. S. 652 (1990). This was the only pre-*McConnell* case in which this Court had ever permitted the Government to restrict political speech based on the corporate identity of the speaker. *Austin* upheld state restrictions on corporate independent expenditures in support of, or in opposition to, any candidate in elections for state office. 494 U. S., at 654–655. The statute had been modeled after the federal statute that BCRA §203 amended, which had been construed to reach only express advocacy, *id.*, at 655, n. 1. And the ad at issue in *Austin* used the magical and forbidden words of express advocacy:

---

[3] In *Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.*, 479 U. S. 238, 248 (1986) *(MCFL)*, we addressed the pre-BCRA version of 2 U. S. C. §441b, which was interpreted to ban corporate treasury expenditures for *express advocacy* in connection with federal elections. We held that, "[r]egardless of whether th[e] concern [for unfair advantage to organizations that amass great wealth] is adequate to support application of §441b to commercial enterprises, *a question not before us*, that justification" did not support application of the statute to the nonprofit organization that brought the challenge in *MCFL*. 479 U. S., at 263 (emphasis added).

8    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of SCALIA, J.

"Elect Richard Bandstra." *Id.*, at 714 (App. to opinion of
KENNEDY, J., dissenting). How did the Court manage to
reach this result without overruling *Bellotti?* It purported
to recognize a different class of corruption: "the corrosive
and distorting effects of immense aggregations of wealth
that are accumulated with the help of the corporate form
and that have little or no correlation to the public's sup-
port for the corporation's political ideas." *Austin, supra,* at
660.

Among the many problems with this "new" theory of
corruption was that it actually constituted "the same 'corro-
sive and distorting effects of immense aggregations of
wealth,' found insufficient to sustain a similar prohibition
just a decade earlier," in *Bellotti. McConnell,* 540 U. S., at
325 (opinion of KENNEDY, J.) (quoting *Austin, supra,* at 660;
citation omitted). Indeed, *Buckley* itself had cautioned that
"[t]he First Amendment's protection against governmental
abridgment of free expression cannot properly be made to
depend on a person's financial ability to engage in public
discussion." 424 U. S., at 49. However, two Members of
*Austin*'s 6-to-3 majority appear to have thought it signifi-
cant that *Austin* involved express advocacy whereas *Bellotti*
involved issue advocacy. 494 U. S., at 675–676 (Brennan,
J., concurring); *id.*, at 678 (STEVENS, J., concurring).[4]

*Austin* was a significant departure from ancient First
Amendment principles. In my view, it was wrongly de-
cided. The flawed rationale upon which it is based is
examined at length elsewhere, including in a dissenting

─────────

[4] The dissent asserts that *Austin* was faithful to *Bellotti*'s principles,
to prove which it quotes a footnote in *Bellotti* leaving open the possibil-
ity that independent expenditures by corporations might someday be
demonstrated to beget *quid-pro-quo* corruption. *Post*, at 12, n. 6 (opin-
ion of SOUTER, J.) (quoting *Bellotti*, 435 U. S., at 788, n. 26). That
someday has never come. No one seriously believes that *independent*
expenditures could possibly give rise to *quid-pro-quo* corruption with-
out being subject to regulation as *coordinated* expenditures.

opinion in *Austin* that a Member of the 5-to-4 *McConnell* majority had joined, see *Austin,* 494 U. S., at 695–713 (opinion of KENNEDY, J., joined by O'Connor, J.). See also *id.,* at 679–695 (SCALIA, J., dissenting); *McConnell,* 540 U. S., at 257–259 (opinion of SCALIA, J.); *id.,* at 325–330 (opinion of KENNEDY, J.); *id.,* at 273–275 (opinion of THOMAS, J.). But at least *Austin* was limited to express advocacy, and *nonexpress* advocacy was presumed to remain protected under *Buckley* and *Bellotti,* even when engaged in by corporations.

Three Terms ago the Court extended *Austin*'s flawed rationale to cover an even broader class of speech. In *McConnell*, the Court rejected a facial overbreadth challenge to BCRA §203's restrictions on corporate and union advertising, which were not limited to express advocacy but covered vast amounts of nonexpress advocacy (embraced within the term "electioneering communications"). 540 U. S., at 203–209. The Court held that, at least in light of the availability of the PAC option, the compelling governmental interest that supported restrictions on corporate expenditures for express advocacy also justified the extension of those restrictions to "electioneering communications," the "vast majority" of which were intended to influence elections. *Id.,* at 206. Of course, the compelling interest to which the Court referred was "'the corrosive and distorting effects of immense aggregations of [corporate] wealth,'" *id.,* at 205 (quoting *Austin*, *supra*, at 660). "The justifications for the regulation of express advocacy," the Court explained, "apply equally" to ads run during the BCRA blackout period "to the extent . . . [those ads] are *the functional equivalent of express advocacy*." 540 U. S., at 206 (emphasis added). The Court found that the "vast majority" of ads aired during the 30- and 60-day periods before elections fit that description. Finally, the Court concluded that, "[e]ven . . . assum[ing] that BCRA will inhibit some constitutionally protected corporate and

10    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of SCALIA, J.

union speech" (*i.e.*, "pure issue ads," *id.*, at 207, or "genuine issue ads," *id.*, at 206, and n. 88), its application to such ads was insubstantial, and thus the statute was not overbroad, *id.*, at 207. But *McConnell* did not foreclose as-applied challenges to §203, *WRTL I*, 546 U. S., at 411–412, which brings me back to the present cases.

## III

The question is whether WRTL meets the standard for prevailing in an as-applied challenge to BCRA §203. Answering that question obviously requires the Court to articulate the standard. The most obvious one, and the one suggested by the Federal Election Commission (FEC) and intervenors, is the standard set forth in *McConnell* itself: whether the advertisement is the "functional equivalent of express advocacy." *McConnell, supra*, at 206. See also Brief for Appellant FEC 18 (arguing that WRTL's "advertisements are the functional equivalent of the sort of express advocacy that this Court has long recognized may be constitutionally regulated"); Reply Brief for Appellant Sen. John McCain et al. in No. 06–970, p. 14 ("[C]ourts should apply the standard articulated in *McConnell;* Congress may constitutionally restrict corporate funding of ads that are the 'functional equivalent of express advocacy' for or against a candidate"). Intervenors flesh out the standard somewhat further: "[C]ourts should ask whether the ad's audience would reasonably understand the ad, in the context of the campaign, to promote or attack the candidate." *Id.*, at 15. The District Court instead articulated a five-factor test that looks to whether the ad under review "(1) describes a legislative issue that is either currently the subject of legislative scrutiny or likely to be the subject of such scrutiny in the near future; (2) refers to the prior voting record or current position of the named candidate on the issue described; (3) exhorts the listener to do anything other than contact the candi-

date about the described issue; (4) promotes, attacks, supports, or opposes the named candidate; and (5) refers to the upcoming election, candidacy, and/or political party of the candidate." 466 F. Supp. 2d 195, 207 (DC 2006). The backup definition of "electioneering communications" contained in BCRA itself, see n. 2, *supra,* offers another possibility. It covers any communication that "promotes or supports a candidate for that office . . . (regardless of whether the communication expressly advocates a vote for or against a candidate) and which also is suggestive of no plausible meaning other than an exhortation to vote for or against a specific candidate." And the principal opinion in this case offers a variation of its own (one bearing a strong likeness to BCRA's backup definition): whether "the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Ante*, at 16.

There is a fundamental and inescapable problem with all of these various tests. Each of them (and every other test that is tied to the public perception, or a court's perception, of the import, the intent, or the effect of the ad) is impermissibly vague and thus ineffective to vindicate the fundamental First Amendment rights of the large segment of society to which §203 applies. Consider the application of these tests to WRTL's ads: There is not the slightest doubt that these ads had an issue-advocacy component. They explicitly urged lobbying on the pending legislative issue of appellate-judge filibusters. The question before us is whether something about them caused them to be the "functional equivalent" of express advocacy, and thus constitutionally subject to BCRA's criminal penalty. Does any of the tests suggested above answer this question with the degree of clarity necessary to avoid the chilling of fundamental political discourse? I think not.

The "functional equivalent" test does nothing more than restate the question (and make clear that the electoral

12    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of SCALIA, J.

advocacy need not be express). The test which asks how the ad's audience "would reasonably understand the ad" provides ample room for debate and uncertainty. The District Court's five-factor test does not (and could not possibly) specify how much weight is to be given to each factor—and includes the inherently vague factor of whether the ad "promotes, attacks, supports, or opposes the named candidate." (Does attacking the king's position attack the king?) The tests which look to whether the ad is "susceptible of no plausible meaning" or "susceptible of no reasonable interpretation" other than an exhortation to vote for or against a specific candidate seem tighter. They ultimately depend, however, upon a judicial judgment (or is it—worse still—a jury judgment?) concerning "reasonable" or "plausible" import that is far from certain, that rests upon consideration of innumerable surrounding circumstances which the speaker may not even be aware of, and that lends itself to distortion by reason of the decisionmaker's subjective evaluation of the importance or unimportance of the challenged speech. In this critical area of political discourse, the speaker cannot be compelled to risk felony prosecution with no more assurance of impunity than his prediction that what he says will be found susceptible of some "reasonable interpretation other than as an appeal to vote for or against a specific candidate." Under these circumstances, "[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech—harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia* v. *Hicks*, 539 U. S. 113, 119 (2003) (citation omitted).

It will not do to say that this burden must be accepted—that WRTL's antifilibustering, constitutionally protected speech can be constrained—in the necessary pursuit of

electoral "corruption." We have rejected the "can't-make-an-omelet-without-breaking-eggs" approach to the First Amendment, even for the infinitely less important (and less protected) speech category of virtual child pornography. In *Ashcroft* v. *Free Speech Coalition*, 535 U. S. 234 (2002), the Government argued:

> "the possibility of producing images by using computer imaging makes it very difficult for it to prosecute those who produce pornography by using real children. Experts . . . may have difficulty in saying whether the pictures were made by using real children or by using computer imaging. The necessary solution . . . is to prohibit both kinds of images." *Id.*, at 254–255.

The Court rejected the principle that protected speech may be banned because it is difficult to distinguish from unprotected speech. *Ibid.* "[T]hat protected speech may be banned as a means to ban unprotected speech," it said, "turns the First Amendment upside down." *Id.*, at 255. The same principle must be applied here. Indeed, it must be applied *a fortiori,* since laws targeting political speech are the principal object of the First-Amendment guarantee. The fact that the line between electoral advocacy and issue advocacy dissolves in practice is an indictment of the statute, not a justification of it.

　*Buckley* itself compels the conclusion that these tests fall short of the clarity that the First Amendment demands. Recall that *Buckley* narrowed the ambiguous phrase "any expenditure . . . relative to a clearly identified candidate" to mean any expenditure "advocating the election or defeat of a candidate." 424 U. S., at 42 (internal quotation marks omitted). But that construction alone did not eliminate the vagueness problem because "the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often

14    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of SCALIA, J.

dissolve in practical application." *Ibid*. Any effort to distinguish between the two based on intent of the speaker or effect of the speech on the listener would "'pu[t] the speaker . . . wholly at the mercy of the varied understanding of his hearers,'" would "'offe[r] no security for free discussion,'" and would "'compe[l] the speaker to hedge and trim.'" *Id.*, at 43 (quoting *Thomas* v. *Collins*, 323 U. S. 516, 535 (1945)). In order to avoid these "constitutional deficiencies," the Court was compelled to narrow the statutory language even further to cover only advertising that used the magic words of express advocacy. 424 U. S., at 43–44.

If a permissible test short of the magic-words test existed, *Buckley* would surely have adopted it. Especially since a consequence of the express-advocacy interpretation was the invalidation of the entire limitation on independent expenditures, in part because the statute (as thus narrowed) could not be an effective limitation on expenditures for electoral advocacy. (It would be "naiv[e]," *Buckley* said, to pretend that persons and groups would have difficulty "devising expenditures that skirted the restriction on express advocacy of election or defeat but nevertheless benefited the candidate's campaign." *Id.*, at 45.) Why did *Buckley* employ such a "highly strained" reading of the statute, *McConnell*, 540 U. S., at 280 (opinion of THOMAS, J.), when broader readings, more faithful to the text, were available that might not have resulted in such underinclusiveness? In particular, after going to the trouble of narrowing the statute to cover "advocacy of [the] election or defeat of a candidat[e]," why not do what the principal opinion in these cases does, which is essentially to preface that phrase with the phrase "susceptible of no reasonable interpretation other than as"? *Ante*, at 16. There is only one plausible explanation: The Court eschewed narrowing constructions that would have been more faithful to the text and more effective at capturing

campaign speech *because those tests were all too vague.*
We cannot now adopt a standard held to be facially vague
on the theory that it is somehow clear enough for constitu-
tional as-applied challenges. If *Buckley* foreclosed such
vagueness in a statutory test, it also must foreclose such
vagueness in an as-applied test.

Though the principal opinion purports to recognize the
"imperative for clarity" in this area of First Amendment
law, its attempt to distinguish its test from the test found
to be vague in *Buckley* falls far short. It claims to be "not
so sure" that *Buckley* rejected its test because *Buckley*'s
holding did not concern "what the constitutional standard
was in the abstract, divorced from specific statutory lan-
guage." *Ante*, at 21, n. 7. Forget about abstractions: The
specific statutory language at issue in *Buckley* was inter-
preted to mean "'advocating the election or defeat of a
candidate,'" and that is materially identical to the opera-
tive language in the principal opinion's test. The principal
opinion's protestation that *Buckley*'s vagueness holding
"d[id] not dictate a constitutional test," *ante*, at 21, n. 7, is
utterly compromised by the fact that the principal opinion
itself relies on the very same vagueness holding to reject
an intent-and-effect test in this case. See *ante*, at 13–14
(citing *Buckley, supra*, at 43–44). It is the *same* vagueness
holding, and the principal opinion cannot invoke it on page
13 of its opinion and disclaim it on page 22. Finally, the
principal opinion quotes *McConnell* for the proposition
that "[t]he *Buckley* Court's 'express advocacy restriction
was an endpoint of statutory interpretation, not a first
principle of constitutional law.'" *Ante*, at 21, n. 7 (quoting
*McConnell*, 540 U. S., at 190). I am not sure why this
cryptic statement is at all relevant, since we are discuss-
ing here the principle of constitutional law that *underlay*
*Buckley*'s express-advocacy restriction. In any case, the
statement is assuredly not a repudiation of *Buckley*'s
vagueness holding, since overbreadth and not vagueness

16    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of SCALIA, J.

was the issue in *McConnell*.[5]

What, then, is to be done?  We could adopt WRTL's proposed test, under which §203 may not be applied to any ad (1) that "focuses on a current legislative branch matter, takes a position on the matter, and urges the public to ask a legislator to take a particular position or action with respect to the matter," and (2) that "does not mention any election, candidacy, political party, or challenger, or the official's character, qualifications, or fitness for office," (3) whether or not it "say[s] that the public official is wrong or right on the issue," so long as it does not expressly say he is "wrong for [the] office."  Brief for Appellee 56–57 (footnote omitted).[6]  Or we could of course adopt the *Buckley*

_____

[5] JUSTICE ALITO's concurrence at least hints that the principal opinion's test *may* impermissibly chill speech, and offers to reconsider *McConnell*'s holding "*[i]f* it turns out that the implementation of the as-applied standard set out in the [principal opinion] impermissibly chills political speech."  *Post*, at 1 (emphasis added).  The wait-and-see approach makes no sense and finds no support in our cases.  How will we know that would-be speakers have been chilled and have not spoken?  If a tree *does not* fall in the forest, can we hear the sound it would have made had it fallen?  Our normal practice is to assess *ex ante* the risk that a standard will have an impermissible chilling effect on First Amendment protected speech.  JUSTICE ALITO seemed to recognize that as recently as, well, today.  In another opinion released this morning, he finds that a proposed test for censoring student speech "can easily be manipulated in dangerous ways," wherefore he "would reject it *before such abuse occurs*."  *Morse* v. *Frederick*, *ante*, at 2 (concurring opinion) (emphasis added).  I would accord the core First Amendment speech at issue here at least the same respect he accords speech in the classroom.

[6] The principal opinion claims that its test is no more vague than WRTL's test.  See *ante*, at 21, n. 7.  I disagree.  WRTL's test requires yes or no answers to a series of precise and focused questions: Does the ad take a position on a legislative matter?  Does it mention the election?  Does it expressly say the candidate is wrong for the office?  A group of children—indeed, even a group of college students—could answer these questions with great consistency.  The principal opinion's test, by contrast, hinges on assessment of the reasonableness of a determination that something does not constitute advocacy of the election or defeat of a candidate.

test of express advocacy. The problem is that, although these tests are clear, they are incompatible with *McConnell*'s holding that §203 is facially constitutional, which was premised on the finding that a vast majority of ads proscribed by §203 are "sham issue ads," 540 U. S., at 185, that fall outside the First Amendment's protection. Indeed, *any* clear rule that would protect all genuine issue ads would cover such a substantial number of ads prohibited by §203 that §203 would be rendered substantially overbroad. The Government claims that even the amorphous test adopted by the District Court "call[s] into question a substantial percentage of the statute's applications," Tr. of Oral Arg. 4,[7] and that *any* test providing relief to WRTL is incompatible with *McConnell*'s facial holding because WRTL's ads are in the "heartland" of what Congress meant to prohibit, Brief for Appellant FEC 18, 28, 36, n. 9. If that is so, then *McConnell* cannot be sustained.

Like the *Buckley* Court and the parties to these cases, I

_____

[7] The same must be said, I think, of the test proposed by the principal opinion. While its coverage is not entirely clear, it would apparently protect even *McConnell*'s paradigmatic example of the functional equivalent of express advocacy—the so-called "Jane Doe ad," which "condemned Jane Doe's record on a particular issue before exhorting viewers to 'call Jane Doe and tell her what you think,'" 540 U. S., at 126–127. Indeed, it at least arguably protects the most "striking" example of a so-called sham issue ad in the *McConnell* record, the notorious "Yellowtail ad," which accused Bill Yellowtail of striking his wife and then urged listeners to call him and "[t]ell him to support family values." *Id.*, at 193–194, n. 78 (internal quotation marks omitted). The claim that §203 on its face does not reach a substantial amount of speech protected under the principal opinion's test—and that the test is therefore compatible with *McConnell*—seems to me indefensible. Indeed, the principal opinion's attempt at distinguishing *McConnell* is unpersuasive enough, and the change in the law it works is substantial enough, that seven Justices of this Court, having widely divergent views concerning the constitutionality of the restrictions at issue, agree that the opinion effectively overrules *McConnell* without saying so. See *post*, at 24–25 (SOUTER, J., dissenting). This faux judicial restraint is judicial obfuscation.

18   FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of SCALIA, J.

recognize the practical reality that corporations can evade
the express-advocacy standard.  I share the instinct that
"[w]hat separates issue advocacy and political advocacy is
a line in the sand drawn on a windy day."  See *McConnell,
supra*, at 126, n. 16 (internal quotation marks omitted);
Brief for Appellant FEC 30; Brief for Appellant Sen. John
McCain et al. in No. 06–970, p. 35.  But the way to indulge
that instinct consistently with the First Amendment is
either to eliminate restrictions on independent expendi-
tures altogether or to *confine* them to one side of the *tradi-
tional* line—the express-advocacy line, set in concrete on a
calm day by *Buckley*, several decades ago.  Section 203's
line is bright, but it bans vast amounts of political advo-
cacy indistinguishable from hitherto protected speech.

The foregoing analysis shows that *McConnell* was mis-
taken in its belief that as-applied challenges could elimi-
nate the unconstitutional applications of §203.  They can
do so only if a test is adopted which contradicts the hold-
ing of *McConnell*—that §203 is facially valid because the
vast majority of pre-election issue ads can constitutionally
be proscribed.  In light of the weakness in *Austin*'s ration-
ale, and in light of the longstanding acceptance of the
clarity of *Buckley*'s express-advocacy line, it was adven-
turous for *McConnell* to extend *Austin* beyond corporate
speech constituting express advocacy.  Today's cases make
it apparent that the adventure is a flop, and that *McCon-
nell*'s holding concerning §203 was wrong.[8]

————————

[8] JUSTICE KENNEDY's opinion in *McConnell* explained why the possi-
bility of corporations' funding speech out of a PAC does not save the
statute from constitutional infirmity.   See 540 U. S., at 330–333.
*McConnell*'s rejection of those arguments rested, of course, upon the
assumption that for non-PAC genuine issue ads as-applied challenges
would be available.  See *id.*, at 207; *WRTL I,* 546 U. S. 410, 411–412
(2006) *(per curiam).*  The discussion today shows that to be mistaken.

The dissent asserts, *post*, at 31, that there is no reason "why substi-
tuting the phrase 'Contact your Senators' for the phrase 'Contact
Senators Feingold and Kohl' would have denied WRTL a constitution-

## IV

Which brings me to the question of *stare decisis*. "*Stare decisis* is not an inexorable command" or "'a mechanical formula of adherence to the latest decision.'" *Payne* v. *Tennessee*, 501 U. S. 808, 828 (1991) (quoting *Helvering* v. *Hallock*, 309 U. S. 106, 119 (1940)). It is instead "'a principle of policy,'" *Payne, supra,* at 828, and this Court has a "considered practice" not to apply that principle of policy "as rigidly in constitutional as in nonconstitutional cases." *Glidden Co.* v. *Zdanok*, 370 U. S. 530, 543 (1962). This Court has not hesitated to overrule decisions offensive to the First Amendment (a "fixed star in our constitutional constellation," if there is one, *West Virginia Bd. of Ed.* v. *Barnette*, 319 U. S. 624, 642 (1943))—and to do so promptly where fundamental error was apparent. Just three years after our erroneous decision in *Minersville School Dist.* v. *Gobitis*, 310 U. S. 586 (1940), the Court corrected the error in *Barnette*. Overruling a constitutional case decided just a few years earlier is far from unprecedented.[9]

————————

ally sufficient . . . alternative." Surely that is not so. The purpose of the ad was to put political pressure upon Senator Feingold to change his position on the filibuster—not only through the constituents who accepted the invitation to contact him, but also through the very existence of an ad bringing to the public's attention that he, Senator Feingold, stood athwart the allowance of a vote on judicial nominees. (Unlike the principal opinion, I think that the fair import of the ad in context.)

[9] See, *e.g.*, *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44 (1996) (overruling *Pennsylvania* v. *Union Gas Co.*, 491 U. S. 1 (1989)); *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200 (1995) (overruling in part *Metro Broadcasting, Inc.* v. *FCC*, 497 U. S. 547 (1990)); *United States* v. *Dixon*, 509 U. S. 688 (1993) (overruling *Grady* v. *Corbin*, 495 U. S. 508 (1990)); *Payne* v. *Tennessee*, 501 U. S. 808 (1991) (overruling *South Carolina* v. *Gathers*, 490 U. S. 805 (1989), and *Booth* v. *Maryland*, 482 U. S. 496 (1987)); *Daniels* v. *Williams*, 474 U. S. 327 (1986) (overruling in part *Parratt* v. *Taylor*, 451 U. S. 527 (1981)); *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528 (1985) (overruling

20    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

Opinion of SCALIA, J.

Of particular relevance to the *stare decisis* question in
these cases is the impracticability of the regime created by
*McConnell. Stare decisis* considerations carry little weight
when an erroneous "governing decisio[n]" has created an
"unworkable" legal regime. *Payne, supra*, at 827. As
described above, the *McConnell* regime is unworkable
because of the inability of any acceptable as-applied test to
validate the facial constitutionality of §203—that is, its
inability to sustain proscription of the vast majority of
issue ads. We could render the regime workable only by
effectively overruling *McConnell* without saying so—
adopting a clear as-applied rule protective of speech in the
"heartland" of what Congress prohibited. The promise of
an administrable as-applied rule that is both effective in
the vindication of First Amendment rights and consistent
with *McConnell*'s holding is illusory.

It is not as though *McConnell* produced a settled body of
law. Indeed, it is far more accurate to say that *McConnell*
*unsettled* a body of law. Not until 1947, with the enact-
ment of the Taft-Hartley amendments to the Federal
Corrupt Practices Act, 1925, did Congress even purport to
regulate campaign-related expenditures of corporations
and unions. See *United States* v. *CIO*, 335 U. S. 106, 107,
113–115 (1948). In the three decades following, this Court
expressly declined to pronounce upon the constitutionality

------

*National League of Cities* v. *Usery*, 426 U. S. 833 (1976)); *United States*
v. *Scott*, 437 U. S. 82 (1978) (overruling *United States* v. *Jenkins*, 420
U. S. 358 (1975)); *National League of Cities, supra*, (overruling *Mary-
land* v. *Wirtz*, 392 U. S. 183 (1968)); *Edelman* v. *Jordan*, 415 U. S. 651
(1974) (overruling in part *Shapiro* v. *Thompson*, 394 U. S. 618 (1969);
*State Dept. of Health and Rehabilitative Servs. of Fla.* v. *Zarate*, 407
U. S. 918 (1972); and *Sterrett* v. *Mothers' & Children's Rights Organiza-
tion*, 409 U. S. 809 (1972)); *Miller* v. *California*, 413 U. S. 15 (1973)
(overruling *Book Named "John Cleland's Memoirs of a Woman of
Pleasure"* v. *Attorney General of Mass.*, 383 U. S. 413 (1966)); *Perez* v.
*Campbell*, 402 U. S. 637 (1971) (overruling *Kesler* v. *Department of
Public Safety of Utah*, 369 U. S. 153 (1962)).

of such restrictions on independent expenditures. See *Pipefitters* v. *United States*, 407 U. S. 385, 400 (1972); *United States* v. *Automobile Workers*, 352 U. S. 567, 591–592 (1957); *CIO, supra*, at 110, 124. When the Court finally did turn to that question, it struck them down. See *Buckley*, 424 U. S. 1. Our subsequent pre-*McConnell* decisions, with the lone exception of *Austin*, disapproved limits on independent expenditures. The modest medicine of restoring First Amendment protection to nonexpress advocacy—speech that was protected until three Terms ago—does not unsettle an established body of law.

Neither do any of the other considerations relevant to *stare decisis* suggest adherence to *McConnell*. These cases do not involve property or contract rights, where reliance interests are involved. *Payne, supra*, at 828. And *McConnell*'s §203 holding has assuredly not become "embedded" in our "national culture." *Dickerson* v. *United States*, 530 U. S. 428, 443–444 (2000) (declining to overrule *Miranda* v. *Arizona*, 384 U. S. 436 (1966), in part because it had become embedded in our national culture). If §203 has had any cultural impact, it has been to undermine the traditional and important role of grassroots advocacy in American politics by burdening the "budget-strapped nonprofit entities upon which many of our citizens rely for political commentary and advocacy." *McConnell,* 540 U. S., at 340 (opinion of KENNEDY, J.).

Perhaps overruling this one part of *McConnell* with respect to one part of BCRA would not "ai[d] the legislative effort to combat real or apparent corruption." *Id.*, at 194. But the First Amendment was not designed to facilitate legislation, even wise legislation. Indeed, the assessment of former House Minority Leader Richard Gephardt, a proponent of campaign-finance reform, may well be correct. He said that "'[w]hat we have is two important values in direct conflict: freedom of speech and our desire for healthy campaigns in a healthy democracy,'" and

22  FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO LIFE, INC.

Opinion of SCALIA, J.

"'[y]ou can't have both.'"  Gibbs, The Wake-Up Call, Time, Feb. 3, 1997, pp. 22, 25.  (He was referring, presumably, to incumbents' notions of healthy campaigns.)  If he was wrong, however, and the two values can coexist, it is pretty clear which side of the equation *this institution* is primarily responsible for.  It is perhaps our most important constitutional task to assure freedom of political speech.  And when a statute creates a regime as unworkable and unconstitutional as today's effort at as-applied review proves §203 to be, it is our responsibility to decline enforcement.

\*    \*    \*

There is wondrous irony to be found in both the genesis and the consequences of BCRA.  In the fact that the institutions it was designed to muzzle—unions and nearly all manner of corporations—for all the "corrosive and distorting effects" of their "immense aggregations of wealth," were utterly impotent to prevent the passage of this legislation that forbids them to criticize candidates (including incumbents).  In the fact that the effect of BCRA has been to concentrate more political power in the hands of the country's wealthiest individuals and their so-called 527 organizations, unregulated by §203.  (In the 2004 election cycle, a mere 24 individuals contributed an astounding total of $142 million to 527s.  S. Weissman & R. Hassan, BCRA and the 527 Groups, in The Election After Reform 79, 92—96 (M. Malbin ed. 2006).)  And in the fact that while these wealthy individuals dominate political discourse, it is this small, grass-roots organization of Wisconsin Right to Life that is muzzled.

I would overrule that part of the Court's decision in *McConnell* upholding §203(a) of BCRA.  Accordingly, I join Parts I and II of today's principal opinion and otherwise concur only in the judgment.

# SUPREME COURT OF THE UNITED STATES

———————

Nos. 06–969 and 06–970

———————

FEDERAL ELECTION COMMISSION, APPELLANT
06–969                        *v.*
WISCONSIN RIGHT TO LIFE, INC.

SENATOR JOHN MCCAIN, ET AL., APPELLANTS
06–970                        *v.*
WISCONSIN RIGHT TO LIFE, INC.

ON APPEALS FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF COLUMBIA

[June 25, 2007]

JUSTICE SOUTER, with whom JUSTICE STEVENS, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

The significance and effect of today's judgment, from which I respectfully dissent, turn on three things: the demand for campaign money in huge amounts from large contributors, whose power has produced a cynical electorate; the congressional recognition of the ensuing threat to democratic integrity as reflected in a century of legislation restricting the electoral leverage of concentrations of money in corporate and union treasuries; and *McConnell* v. *Federal Election Comm'n*, 540 U. S. 93 (2003), declaring the facial validity of the most recent Act of Congress in that tradition, a decision that is effectively, and unjustifiably, overruled today.[1]

I

The indispensable ingredient of a political candidacy is

————————

[1] Substantially for the reasons stated by the Court, *ante*, at 7–10, I believe these cases are justiciable.

2    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

S<small>OUTER</small>, J., dissenting

money for advertising. In the 2004 campaign, more than
half of the combined expenditures by the two principal
presidential candidates (excluding fundraising) went for
media time and space. See The Costliest Campaign,
Washington Post, Dec. 30, 2004, p. A7.[2] And in the 2005–

_____

[2] Between candidates, political action committees, interest groups,
and national, state, and local parties, spending on the 2004 state and
federal elections exceeded $4 billion. K. Patterson, Spending in the
2004 Election, in Financing the 2004 Election 68, 71, tbl. 3–1 (D.
Magleby, A. Corrado, & K. Patterson eds. 2006). Congressional cam-
paigns spent over $1 billion in 2004, *id.*, at 75, tbl. 3–4, state legislative
candidates raised three-quarters of a billion dollars in the 2003–2004
election cycle, The Institute on Money in State Politics, State Elec-
tions Overview 2004, p. 2 (2005), available at http://www.followthe
money.org/press/Reports/200601041.pdf (all Internet materials as
visited June 20, 2007, and available in Clerk of Court's case file), and
gubernatorial candidates raised over $200 million, *id.*, at 6. State
judicial campaigns have become flush with cash as well, with state
supreme court candidates raising over $30 million in the 2005–2006
cycle. Sample et al., The New Politics of Judicial Elections 2006, p. 16
(2007), available at http://www.justiceatstake.org/files/NewPoliticsof
JudicialElections2006.pdf. In a single 2004 judicial election in Illinois,
the candidates raised a breathtaking $9.3 million, an amount the
winner called "'obscene.'" The Justice-elect wondered, "'How can
people have faith in the system?'" Moyer & Brandenburg, Big Money
and Special Interests are Warping Judicial Elections, Legal Times, Oct.
9, 2006, p. 50 (quoting Justice Lloyd Karmeier of the Illinois Supreme
Court). According to polling data, the fear that people will lose trust in
the system is well founded. With respect to judicial elections, a context
in which the influence of campaign contributions is most troubling, a
recent poll of business leaders revealed that about four in five thought
that campaign contributions have at least "some influence" on judges'
decisions, while 90 percent are at least "somewhat concerned" that
"[c]ampaign contributions and political pressure will make judges
accountable to politicians and special interest groups instead of the law
and the Constitution." Zogby International, Attitudes and Views of
American Business Leaders on State Judicial Elections and Political
Contributions to Judges 4–5 (May 2007), available at http://www.
ced.org/docs/report/report_2007judicial_survey.pdf. People have similar
feelings about other elected officials. See M. Mellman & R. Wirthlin,
Public Views of Party Soft Money, in Inside the Campaign Finance

2006 election cycle, the expenditure of more than $2 billion on television shattered the previous record, even without a presidential contest. See Inside Media, MediaWeek, Nov. 20, 2006, p. 18. The portent is for still greater spending. By the end of March 2007, almost a year before the first primary and more than 18 months before the general election, presidential candidates had already raised over $150 million. See Balz, Fundraising Totals Challenge Early Campaign Assumptions, Washington Post, Apr. 17, 2007, p. A1 (citing figures and noting that "[t]he campaign is living up to its reputation as the most expensive in U. S. history"). To reach this total, the leading fundraisers collected over $250,000 per day in the first quarter of 2007, Mullins, Clinton Leads the Money Race, Wall Street Journal, Apr. 16, 2007, p. A8, and the eventual nominees are expected to raise $500 million apiece (about $680,000 per day over a 2-year election cycle), Kirkpatrick and Pilhofer, McCain Lags in Income But Excels in Spending, Report Shows, N. Y. Times, Apr. 15, 2007, p. 20.

The indispensability of these huge sums has two significant consequences for American Government that are particularly on point here. The enormous demands, first, assign power to deep pockets. See Balz, *supra*, at A6 ("For all the interest in Internet fundraising, big donors still ruled in the first quarter, with roughly 80 percent of donations coming in amounts of $1,000 or more"). Candidates occasionally boast about the number of contributors they have, but the headlines speaking in dollars reflect political reality. See, *e.g.*, Mullins, *supra*, at A8 (headlined "Clinton Leads the Money Race").

Some major contributors get satisfaction from pitching in for their candidates, but political preference fails to

---

Battle 266–269 (A. Corrado, T. Mann, & T. Potter eds. 2003) (hereinafter Mellman & Wirthlin); see also *infra*, at 4–5.

4    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

SOUTER, J., dissenting

account for the frequency of giving "substantial sums to *both* major national parties," *McConnell*, 540 U. S., at 148, a practice driven "by stark political pragmatism, not by ideological support for either party or their candidates," Brief for Committee for Economic Development et al. as *Amici Curiae* in *McConnell*, O. T. 2003, No. 02–1674, p. 3 (hereinafter CED Brief). What the high-dollar pragmatists of either variety get is special access to the officials they help elect, and with it a disproportionate influence on those in power. See *McConnell, supra*, at 130–131. As the erstwhile officer of a large American corporation put it, "'[b]usiness leaders believe—based on experience and with good reason—that . . . access gives them an opportunity to shape and affect governmental decisions and that their ability to do so derives from the fact that they have given large sums of money to the parties.'" CED Brief 9. At a critical level, contributions that underwrite elections are leverage for enormous political influence.

Voters know this. Hence, the second important consequence of the demand for big money to finance publicity: pervasive public cynicism. A 2002 poll found that 71 percent of Americans think Members of Congress cast votes based on the views of their big contributors, even when those views differ from the Member's own beliefs about what is best for the country. Mellman & Wirthlin 267; see also *id.*, at 266 ("In public opinion research it is uncommon to have 70 percent or more of the public see an issue the same way. When they do, it indicates an unusually strong agreement on that issue"). The same percentage believes that the will of contributors tempts Members to vote against the majority view of their constituents. *Id.*, at 267. Almost half of Americans believe that Members often decide how to vote based on what big contributors to their party want, while only a quarter think Members often base their votes on perceptions of what is best for the country or their constituents. *Ibid.*

Devoting concentrations of money in self-interested hands to the support of political campaigning therefore threatens the capacity of this democracy to represent its constituents and the confidence of its citizens in their capacity to govern themselves. These are the elements summed up in the notion of political integrity, giving it a value second to none in a free society.

## II

If the threat to this value flowing from concentrations of money in politics has reached an unprecedented enormity, it has been gathering force for generations. Before the turn of the last century, as now, it was obvious that the purchase of influence and the cynicism of voters threaten the integrity and stability of democratic government, each derived from the responsiveness of its law to the interests of citizens and their confidence in that focus. The danger has traditionally seemed at its apex when no reasonable limits constrain the campaign activities of organizations whose "unique legal and economic characteristics" are tailored to "facilitat[e] the amassing of large treasuries," *Austin* v. *Michigan Chamber of Commerce*, 494 U. S. 652, 658, 660 (1990). Corporations were the earliest subjects of concern; the same characteristics that have made them engines of the Nation's extraordinary prosperity have given them the financial muscle to gain "advantage in the political marketplace" when they turn from core corporate activity to electioneering, *Federal Election Comm'n* v. *Massachusetts Citizens for Life, Inc.*, 479 U. S. 238, 258 (1986) *(MCFL)*, and in "Congress' judgment" the same concern extends to labor unions as to corporations, *Federal Election Comm'n* v. *National Right to Work Comm.*, 459 U. S. 197, 210 (1982); see also *Austin, supra,* at 661.

## A

In the wake of the industrial expansion after the Civil War there developed a momentum for civic reform that led

6    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

SOUTER, J., dissenting

to the enactment of the Pendleton Civil Service Act of
1883, ch. 27, 22 Stat. 403, which stopped political parties
from raising money through compulsory assessments on
federal employees. Not unnaturally, corporations filled
the vacuum, see R. Mutch, Campaigns, Congress, and
Courts xvi–xvii (1988) (hereinafter Mutch), and in due
course demonstrated what concentrated capital could do.
The resulting political leverage disturbed "the confidence
of the plain people of small means in our political institu-
tions," E. Root, The Political Use of Money (delivered Sept.
3, 1894), in Addresses on Government and Citizenship
141, 143–144 (R. Bacon & J. Scott eds. 1916) (cited in
*United States* v. *Automobile Workers,* 352 U. S. 567, 571
(1957)), and the 1904 Presidential campaign eventually
"crystallized popular sentiment" on the subject of money
and politics, *id.,* at 572. In his next message to Congress,
President Theodore Roosevelt invoked the power "to pro-
tect the integrity of the elections of its own officials [as]
inherent" in government, and called for "vigorous meas-
ures to eradicate" perceived political corruption, for he
found "no enemy of free government more dangerous and
none so insidious."[3] 39 Cong. Rec. 17 (1904).

The following year, the President urged that "[a]ll con-
tributions by corporations to any political committee or for
any political purpose should be forbidden by law." 40
Cong. Rec. 96 (1905). His call was seconded by the Senate
sponsor of the eventual legislation, whose "sad thought
[was] that the Senate is discredited by the people of the
United States as being a body more or less corruptible or

---

[3] Perhaps the President's call was inspired by the accusations from
his own 1904 Democratic opponent, Judge Alton B. Parker, that the
Republican camp accepted corporate campaign contributions intended
to buy influence. See A. Corrado, Money and Politics: A History of
Federal Campaign Finance Law, in A. Corrado, T. Mann, D. Ortiz, & T.
Potter, The New Campaign Finance Sourcebook 7, 10–11 (2005) (here-
inafter Campaign Finance Sourcebook).

corrupted." *Id.*, at 229. The President persisted in his 1906 message to Congress with another call for "a law prohibiting all corporations from contributing to the campaign expenses of any party," 41 Cong. Rec. 22, and the next year Congress passed the Tillman Act of 1907:

> "it shall be unlawful for any national bank, or any corporation organized by authority of any laws of Congress, to make a money contribution in connection with any election to any political office. It shall also be unlawful for any corporation whatever to make a money contribution in connection with any election at which Presidential and Vice-Presidential electors or a Representative in Congress is to be voted for or any election by any State legislature of a United States Senator." 34 Stat. 864–865.[4]

The aim was "not merely to prevent the subversion of the integrity of the electoral process," but "to sustain the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government." *Automobile Workers*, *supra*, at 575.

## B

Thirty years later, new questions about the electoral influence of accumulated wealth surfaced as organized labor expanded during the New Deal. In the 1936 election, labor unions contributed "unprecedented" sums, S. Rep. No. 151, 75th Cong., 1st Sess., 127 (1937), the greater part of them by the United Mine Workers, see Campaign Finance Sourcebook 17. And in due course

---

[4] A bill along similar lines had been unsuccessfully introduced years earlier by Senator William Chandler, a New Hampshire Republican whom the railroad interests helped defeat in 1900. See Mutch 4–6 (discussing the unlikely alliance between Chandler, a radical Republican, and Senator Benjamin Tillman, a South Carolina Democrat who ultimately succeeded in enacting the law that carries his name).

8    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

SOUTER, J., dissenting

reaction began to build: "[w]artime strikes gave rise to fears of the new concentration of power represented by the gains of trade unionism. And so the belief grew that, just as the great corporations had made huge political contributions to influence governmental action . . . , the powerful unions were pursuing a similar course, and with the same untoward consequences for the democratic process." *Automobile Workers*, *supra*, at 578. Congress responded with the War Labor Disputes Act of 1943, which extended the ban on corporate donations to labor organizations, ch. 144, §9, 57 Stat. 167–168, an extension that was made permanent in the Labor Management Relations Act, 1947, better known as Taft-Hartley, §304, 61 Stat. 159–160.

C

At the same time, Congress had another worry that foreshadows our case today. It was concerned that the statutory prohibition on corporate "contribution[s]" was being so narrowly construed as to open a "loophole whereby corporations, national banks, and labor organizations are enabled to avoid the obviously intended restrictive policy of the statute by garbing their financial assistance in the form of an 'expenditure' rather than a contribution." S. Rep. No. 1, 80th Cong., 1st Sess., 38–39 (1947); see also H. Rep. No. 2739, 79th Cong., 2d Sess., 40 (1947) ("The intent and purpose of the provision of the act prohibiting any corporation or labor organization making any contribution in connection with any election would be wholly defeated if it were assumed that the term 'making any contribution' related only to the donating of money directly to a candidate, and excluded the vast expenditures of money in the activities herein shown to be engaged in extensively. Of what avail would a law be to prohibit the contributing direct to a candidate and yet permit the expenditure of large sums in his behalf?"). Taft-Hartley therefore extended the prohibition to any

"contribution or expenditure" by a corporation or a union "in connection with" a federal election.   §304, 61 Stat. 159.[5]

## D

The new law left open, however, the right of a union to spend money on electioneering from a segregated fund raised specifically for that purpose from members, but not drawn from the general treasury.   Segregated funding entities, the now-familiar political action committees or PACs, had been established prior to Taft-Hartley, and we concluded in *Pipefitters* v. *United States*, 407 U. S. 385, 409 (1972), that Taft-Hartley did not prohibit "union contributions and expenditures from political funds financed in some sense by the voluntary donations of employees."

This balance of authorized and restricted financing methods for corporate and union electioneering was made explicit in the Federal Election Campaign Act of 1971 (FECA).   See 86 Stat. 10 ("[T]he phrase 'contribution or expenditure' . . . shall not include . . . the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation or labor organization").  "[T]he underlying theory [of the statute was] that substantial general purpose treasuries should not be diverted to political purposes, both because of the effect on the political process of such aggregated wealth and out of concern for the dissenting member or stockholder."   117 Cong. Rec. 43381 (1971) (statement of Rep. Hansen).  But the PAC exception main-

-----

[5] Taft-Hartley also specified that the prohibition extends to primary elections, 61 Stat. 159, an extension that had been thought likely to exceed the authority of Congress under Art. I, §4 of the Constitution until our decision in *United States* v. *Classic*, 313 U. S. 299, 317 (1941). See H. Rep. No. 2093, 78th Cong., 2d Sess., 8–9 (1945) (discussing the significance of *Classic*).

10    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

SOUTER, J., dissenting

tained "'the proper balance in regulating corporate and union political activity required by sound policy and the Constitution.'"    *Pipefitters*, *supra*, at 431 (quoting 117 Cong. Rec. 43381 (statement of Rep. Hansen)).[6]

E

In 1986, in *MCFL*, we reexamined the longstanding ban on spending corporate and union treasury funds "in connection with" federal elections, 2 U. S. C. §441b, and drew two conclusions implicated in the present case.  First, we construed the "in connection with" phrase in much the same way we had interpreted comparable FECA language challenged in *Buckley* v. *Valeo*, 424 U. S. 1 (1976) *(per curiam)*.  We held that to avoid vagueness, the product of prohibited corporate and union expenditures "must constitute 'express advocacy' in order to be subject to the prohibition." *MCFL*, 479 U. S., at 249.

We thus held that the prohibition applied "only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." *Buckley*, 424 U. S., at 44.  "[E]xpress terms," in turn, meant what had already become known as "magic words," such as "'vote for,' 'elect,' 'support,' 'cast your ballot for,' 'Smith for Congress,' 'vote

---

[6] FECA also validated corporate and union spending on internal communications and nonpartisan activities designed to promote voting. See 86 Stat. 10 ("[T]he phrase 'contribution or expenditure' . . . shall not include communications by a corporation to its stockholders and their families, or by a labor organization to its members and their families on any subject [or] nonpartisan registration and get-out-the-vote campaigns by a corporation aimed at its stockholders and their families or by a labor organization aimed at its members and their families").  "'If an organization . . . believes that certain candidates pose a threat to its well-being or the well-being of its members or stockholders, it should be able to get its views to those members or stockholders. . . . Both union members and stockholders have the right to expect this expert guidance.'" *Pipefitters*, 407 U. S., at 431, n. 42 (quoting 117 Cong. Rec. 43380 (statement of Rep. Hansen)).

against,' 'defeat,' 'reject.'" *Ibid.*, n. 52.  The consequence of this construction was obvious: it pulled the teeth out of the statute, as we had understood when we announced it in its earlier application in *Buckley:*

> "The exacting interpretation of the statutory language necessary to avoid unconstitutional vagueness . . . undermines the limitation's effectiveness as a loophole-closing provision by facilitating circumvention by those seeking to exert improper influence upon a candidate or officeholder.  It would naively underestimate the ingenuity and resourcefulness of persons and groups desiring to buy influence to believe that they would have much difficulty devising expenditures that skirted the restriction on express advocacy of election or defeat but nevertheless benefited the candidate's campaign." *Id.*, at 45.

Nor was the statute, even as thus narrowed, enforceable against the particular advocacy corporation challenging the limit in *MCFL*.  This was the second holding of *MCFL* relevant here; we explained that the congressional effort to limit the political influence of corporate money "has reflected concern not about use of the corporate form *per se*, but about the potential for unfair deployment of wealth for political purposes," 479 U. S., at 259.  We held that this "legitima[te]" concern could not reasonably extend to electioneering expenditures by the corporation at issue in *MCFL*, which neither "engage[d] in business activities" nor accepted donations from business corporations and unions (and thus could not serve as a "condui[t]" for political spending by those entities).  *Id.*, at 263–264.[7]

---

[7] Compare *Austin* v. *Michigan Chamber of Commerce*, 494 U. S. 652, 664 (1990) (First Amendment does not protect a nonprofit corporation from expenditure limits if the corporation accepts corporate and union contributions, lest corporations and unions readily "circumvent" restrictions on their own election spending "by funneling money through"

12    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

SOUTER, J., dissenting

## F

As was expectable, narrowing the corporate-union elec-
tioneering limitation to magic words soon reduced it to
futility. "[P]olitical money . . . is a moving target," Issa-
charoff & Karlan, The Hydraulics of Campaign Finance
Reform, 77 Tex. L. Rev. 1705, 1707 (1999), and the "inge-
nuity and resourcefulness" of political financiers revealed
the massive regulatory gap left by the "magic words" test,

---

nonprofits). JUSTICE SCALIA asserts that *Austin* "strayed far from" the
principles we announced in *First Nat. Bank of Boston* v. *Bellotti*, 435
U. S. 765 (1978). *Ante*, at 7 (opinion concurring in part and concurring
in judgment). *Bellotti*, however, concerned corporate spending in
connection with a referendum, and we went out of our way in that case
to avoid casting any doubt upon the constitutionality of limiting corpo-
rate expenditures during candidate elections. We said:

"The overriding concern behind the enactment of [the federal restric-
tions on corporate contributions and expenditures] was the problem of
corruption of elected representatives through the creation of political
debts. The importance of the governmental interest in preventing this
occurrence has never been doubted. The case before us presents no
comparable problem, and our consideration of a corporation's right to
speak on issues of general public interest implies no comparable right
in the quite different context of participation in a political campaign for
election to public office. Congress might well be able to demonstrate
the existence of a danger of real or apparent corruption in independent
expenditures by corporations to influence candidate elections." 435
U. S., at 788, n. 26 (citations omitted).

Eight years before *Austin*, we unanimously reaffirmed that *Bellotti*
"specifically pointed out that in elections of candidates to public office,
unlike in referenda on issues of general public interest, there may well
be a threat of real or apparent corruption." *Federal Election Comm'n* v.
*National Right to Work Comm.*, 459 U. S. 197, 210, n. 7 (1982). Then,
four years later, in *MCFL*, we also noted that an expenditure limit
offering corporations a PAC alternative is "distinguishable from the
complete foreclosure of any opportunity for political speech" that we
addressed in *Bellotti*. 479 U. S., at 259, n. 12. So *Austin* did not
"stra[y]" from *Bellotti*, *ante*, at 7 (opinion of SCALIA, J.); the reasons
*Bellotti* was not controlling in *Austin* had been clearly foreshadowed in
*Bellotti* itself and confirmed repeatedly in our decisions leading up to
*Austin*.

*Buckley*, 424 U. S., at 45.  It proved to be the door through which so-called "issue ads" of current practice entered American politics.

An issue ad is an advertisement on a political subject urging the reader or listener to let a politician know what he thinks, but containing no magic words telling the recipient to vote for or against anyone.  By the 1996 election cycle, between $135 and $150 million was being devoted to these ads, see *McConnell*, 540 U. S., at 127, n. 20, and because they had no magic words, they failed to trigger the limitation on union or corporate expenditures for electioneering.  Experience showed, however, just what we foresaw in *Buckley*, that the line between "issue" broadcasts and outright electioneering was a patent fiction, as in the example of a television "issue ad" that ran during a Montana congressional race between Republican Rick Hill and Democrat Bill Yellowtail in 1996:

> ""Who is Bill Yellowtail?  He preaches family values but took a swing at his wife.  And Yellowtail's response?  He only slapped her.  But 'her nose was not broken.'  He talks law and order . . . but is himself a convicted felon.  And though he talks about protecting children, Yellowtail failed to make his own child support payments—then voted against child support enforcement.  Call Bill Yellowtail.  Tell him to support family values."" *McConnell, supra*, at 193–194, n. 78.[8]

_____

[8] Or this example from a Texas district where Democrat Nick Lampson challenged incumbent Republican Steve Stockman, and where the AFL–CIO ran the following advertisement in September and October of 1996:

"'[Narrator] What's important to America's families?  [Middle-aged man] "My pension is very important because it will provide a significant amount of my income when I retire."  [Narrator] And where do the candidates stand?  Congressman Steve Stockman voted to make it easier for corporations to raid employee pension funds.  Nick Lampson

14    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

SOUTER, J., dissenting

There are no "magic words" of "express advocacy" in that
statement, but no one could deny with a straight face that
the message called for defeating Yellowtail.

There was nothing unusual about the Yellowtail issue
ad in 1996, and an enquiry into campaign practices by the
Senate Committee on Governmental Affairs found as a
general matter that "the distinction between issue and
express advocacy . . . appeared to be meaningless in the
1996 elections." 3 S. Rep. No. 105–167, p. 3994 (1998).
"'"What separates issue advocacy and political advocacy is
a line in the sand drawn on a windy day."'" *McConnell*,
*supra*, at 126, n. 16[9] (quoting the former director of an
advocacy organization's PAC). Indeed, the President of
the AFL–CIO stated that "'the bulk of'" its ads were tar-
geted for broadcast in districts represented by "'first-term,
freshmen Republicans who . . . may be defeatable,'" 3
S. Rep. No. 105–167, at 3997, 3998, and n. 23, and the
Senate Committee found that the union used a "$.15 per
member, per month assessment" to finance "issue ads that
were clearly designed to influence the outcome of the
election," *id.*, at 3999, 4000. Not surprisingly, "ostensibly
independent" ads "were often actually coordinated with,
and controlled by, the campaigns." *McConnell*, *supra*, at
131.

Nor was it surprising that the Senate Committee heard
testimony that "'[w]ithout taming'" the vast sums flowing
into issue ads, "'campaign finance reform—no matter how
thoroughly it addresses . . . perceived problems—will come

_____

opposes that plan. He supports new safeguards to protect employee
pension funds. When it comes to your pension, there is a difference.
Call and find out.'" *McConnell* v. *FEC*, 251 F. Supp. 2d 176, 201 (DC
2003) *(per curiam)* (emphasis deleted; brackets in original).

[9] Quoting *McConnell*, *supra*, at 536, 537 (Kollar-Kotelly, J.) (in turn
quoting T. Metaksa, Opening Remarks at the American Assn. of Politi-
cal Consultants Fifth General Session on "Issue Advocacy," Jan. 17,
1997, p. 2).

to naught.'"　3 S. Rep. No. 105–167, at 4480 (quoting testimony of Professor Daniel R. Ortiz).　The Committee predicted that "if the course of non-action is followed, . . . Congress would be encouraging further growth of union, corporate nonprofit and individual independent expenditures."　*Id.*, at 4481.[10]　The next two elections validated the

---

[10] The Senate Committee was not alone in its concerns.　In Wisconsin, for example, the Governor's Blue-Ribbon Commission on Campaign Finance Reform reported:

"Especially beginning in 1996, issue advocacy during the campaign season dramatically expanded in Wisconsin.

.　　　　.　　　　.　　　　.　　　　.

"The Commission concludes that, in each of these cases, the expenditures were clearly campaign-oriented activities.　They were quite clearly designed to influence the electoral process.　They were focused either on electing or defeating a candidate.　The Commission bases this conclusion on the following points:

"Although those paying for the activities claimed they were aimed solely at educating voters on the issues, they each mentioned the names of candidates for office.

"They occurred only when election races were in progress that involved a contest between an incumbent and a challenger.　When the election was over, the activities ended.

"The activity has occurred after legislative sessions when the issues about which advocacy was occurring were not being deliberated by the legislature.

"The activity occurred in campaign season, between the candidate's filing for candidacy and election time.　Advertisements of this sort have tended to occur at virtually no other time.

"The activity involved the electronic media, mass mailings, or centrally located telephone banks.

.　　　　.　　　　.　　　　.　　　　.

"The explosive growth of campaign-based advocacy, without even disclosure of its activities and funding sources, poses a grave risk to the integrity of elections. It has created a two-tiered campaign process: one, based in candidates and political parties, which is tightly regulated and controlled; the other, based in interest group activity under the guise of 'issue advocacy' but actually quite clearly election-focused, which lies beyond accountability."　1 Governor's Blue-Ribbon Commission on Campaign Finance Reform, State of Wisconsin: Report of the Commis-

16    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

SOUTER, J., dissenting

prediction: during the 1998 cycle, spending on issue ads doubled to between $270 and $340 million, and the figure climbed to $500 million in the 2000 cycle. *McConnell*, 540 U. S., at 127, n. 20. A report from the Annenberg Public Policy Center concluded that "[t]he type of issue ad that dominated depended greatly on how close we were to the general election. . . . Though candidate-centered issue ads always made up a majority of issue ads, as the election approached the percent [of] candidate-centered spots increased . . . such that by the last two months before the election almost all televised issue spots made a case for or against a candidate." Issue Advertising in the 1999–2000 Election Cycle 14 (2001).

They were worth the money of those who ultimately paid for them. According to one former Senator, "'Members will . . . be favorably disposed to those who finance'" interest groups that run "'issue ads'" when those financiers "'later seek access to discuss pending legislation.'" *McConnell* v. *FEC*, 251 F. Supp. 2d 176, 556 (DC 2003) (Kollar-Kotelly, J.) (quoting the declaration of Dale Bumpers).

The congressional response was §203 of the Bipartisan Campaign Reform Act of 2002 (BCRA), 116 Stat. 91, which redefined prohibited "expenditure" so as to restrict corporations and unions from funding "electioneering communication[s]" out of their general treasuries. 2 U. S. C. §441b(b)(2) (2000 ed., Supp. IV). The new phrase "electioneering communication" was narrowly defined in BCRA's §201 as "any broadcast, cable, or satellite communication" that

>    "(I) refers to a clearly identified candidate for Federal office;
>    "(II) is made within—
>    "(aa) 60 days before a general, special, or runoff

——————

sion, available at http://www.lafollette.wisc.edu/campaign_reform/final. htm.

election for the office sought by the candidate; or

    "(bb) 30 days before a primary or preference election, or a convention or caucus of a political party that has authority to nominate a candidate, for the office sought by the candidate; and

    "(III) in the case of a communication which refers to a candidate for an office other than President or Vice President, is targeted to the relevant electorate." §434(f)(3)(A)(i).

## III

In *McConnell*, we found this definition to be "easily understood and objectiv[e]," raising "none of the vagueness concerns that drove our analysis" of the statutory language at issue in *Buckley* and *MCFL*, 540 U. S., at 194, and we held that the resulting line separating regulated election speech from general political discourse does not, on its face, violate the First Amendment. We rejected any suggestion "that *Buckley* drew a constitutionally mandated line between express advocacy [with magic words] and so-called issue advocacy [without them], and that speakers possess an inviolable First Amendment right to engage in the latter category of speech." *Id.*, at 190. To the contrary, we held that "our decisions in *Buckley* and *MCFL* were specific to the statutory language before us; they in no way drew a constitutional boundary that forever fixed the permissible scope of provisions regulating campaign-related speech." *Id.*, at 192–193. "[T]he presence or absence of magic words cannot meaningfully distinguish electioneering speech," which is prohibitable, "from a true issue ad," we said, since ads that "esche[w] the use of magic words . . . are no less clearly intended to influence the election." *Id.*, at 193. We thus found "[l]ittle difference . . . between an ad that urged viewers to 'vote against Jane Doe' and one that condemned Jane Doe's record on a particular issue before exhorting viewers to

18    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

SOUTER, J., dissenting

'call Jane Doe and tell her what you think.'" *Id.*, at 126–127.

We understood that Congress had a compelling interest in limiting this sort of electioneering by corporations and unions, for §203 exemplified a tradition of "repeatedly sustained legislation aimed at 'the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public's support for the corporation's political ideas.'" *Id.*, at 205 (quoting *Austin*, 494 U. S., at 660). Nor did we see any plausible claim of substantial overbreadth from incidentally prohibiting ads genuinely focused on issues rather than elections, given the limitation of "electioneering communication" by time, geographical coverage, and clear reference to candidate. "Far from establishing that BCRA's application to pure issue ads is substantial, either in an absolute sense or relative to its application to election-related advertising, the record strongly supports the contrary conclusion." 540 U. S., at 207. Finally, we underscored the reasonableness of the §203 line by emphasizing that it defined a category of limited, but not prohibited, corporate and union speech: "Because corporations can still fund electioneering communications with PAC money, it is 'simply wrong' to view [§203] as a 'complete ban' on expression rather than a regulation." *Id.*, at 204 (quoting *Federal Election Comm'n* v. *Beaumont*, 539 U. S. 146, 162 (2003)). Thus "corporations and unions may finance genuine issue ads [in the runup period] by simply avoiding any specific reference to federal candidates, or in doubtful cases by paying for the ad from a segregated [PAC] fund." 540 U. S., at 206.

We may add that a nonprofit corporation, no matter what its source of funding, is free to pelt a federal candidate like Jane Doe with criticism or shower her with praise, by name and within days of an election, if it speaks through a newspaper ad or on a website, rather than a

"broadcast, cable, or satellite communication," 2 U. S. C. §434(f)(3)(A)(i) (2000 ed., Supp. IV). And a nonprofit may use its general treasury to pay for clearly "electioneering communication[s]" so long as it declines to serve as a conduit for money from business corporations and unions (and thus qualifies for the *MCFL* exception).[11]

\*    \*    \*

In sum, Congress in 1907 prohibited corporate contributions to candidates and in 1943 applied the same ban to unions. In 1947, Congress extended the complete ban from contributions to expenditures "in connection with" an election, a phrase so vague that in 1986 we held it must be confined to instances of express advocacy using magic words. Congress determined, in 2002, that corporate and union expenditures for fake issue ads devoid of magic words should be regulated using a narrow definition of "electioneering communication" to reach only broadcast ads that were the practical equivalents of express advocacy. In 2003, this Court found the provision free from vagueness and justified by the concern that drove its enactment.

This century-long tradition of legislation and judicial precedent rests on facing undeniable facts and testifies to an equally undeniable value. Campaign finance reform has been a series of reactions to documented threats to electoral integrity obvious to any voter, posed by large sums of money from corporate or union treasuries, with no redolence of "grassroots" about them. Neither Congress's decisions nor our own have understood the corrupting

_____

[11] Campaign finance laws also continue to provide several specific exemptions from the general prohibition on corporate election-related spending, including communications "on any subject" with stockholders and certain personnel, as well as "nonpartisan registration and get-out-the-vote campaigns" similarly aimed at shareholders and personnel. §441b(b)(2); see also n. 6, *supra*.

20    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO LIFE, INC.

SOUTER, J., dissenting

influence of money in politics as being limited to outright bribery or discrete *quid pro quo;* campaign finance reform has instead consistently focused on the more pervasive distortion of electoral institutions by concentrated wealth, on the special access and guaranteed favor that sap the representative integrity of American government and defy public confidence in its institutions. From early in the 20th century through the decision in *McConnell*, we have acknowledged that the value of democratic integrity justifies a realistic response when corporations and labor organizations commit the concentrated moneys in their treasuries to electioneering.

## IV

The corporate appellee in these cases, Wisconsin Right to Life (WRTL), is a nonprofit corporation funded to a significant extent by contributions from other corporations.[12] In 2004, WRTL accepted over $315,000 in corporate donations, App. 40, and of its six general fund contributions of $50,000 or more between 2002 and 2005, three, including the largest (for $140,000), came from corporate donors, *id.*, at 118–121.

WRTL also runs a PAC, funded by individual donations, which has been active over the years in making independent campaign expenditures, as in the previous two elections involving Senator Feingold. *Id.*, at 15. During the 1998 campaign, for example, WRTL's PAC spent $60,000 to oppose him. *Ibid.* In 2004, however, despite a sharp nationwide increase in PAC receipts, WRTL focused its fundraising on its corporate treasury, not the PAC, *id.*, at 41–43, and took in only $17,000 in PAC contributions, as

---

[12] To the extent these facts are disputed, we must view them in the light most favorable to the Federal Election Commission and the intervenor-defendants, since the District Court granted WRTL's motion for summary judgment. See *Pennsylvania State Police* v. *Suders*, 542 U. S. 129, 134 (2004).

against over $150,000 during 2000, *id.*, at 41–42.

Throughout the 2004 senatorial campaign, WRTL made no secret of its views about who should win the election and explicitly tied its position to the filibuster issue. Its PAC issued at least two press releases saying that its "Top Election Priorities" were to "Re-elect George W. Bush" and "Send Feingold Packing!" *Id.*, at 78–80, 82–84. In one of these, the Chair of WRTL's PAC was quoted as saying, "'We do not want Russ Feingold to continue to have the ability to thwart President Bush's judicial nominees.'" *Id.*, at 82–83. The Spring 2004 issue of the WRTL PAC's quarterly magazine ran an article headlined "Radically Pro-Abortion Feingold Must Go!", which reported that "Feingold has been active in his opposition to Bush's judicial nominees" and said that "the defeat of Feingold must be uppermost in the minds of Wisconsin's pro-life community in the 2004 elections." *Id.*, at 101–103.

It was under these circumstances that WRTL ran the three television and radio ads in question. The bills for them were not paid by WRTL's PAC, but out of the general treasury with its substantial proportion of corporate contributions; in fact, corporations earmarked more than $50,000 specifically to pay for the ads, *id.*, at 41. Each one criticized an unnamed "group of Senators" for "using the filibuster delay tactic to block federal judicial nominees from a simple 'yes' or 'no' vote," and described the Senators' actions as "politics at work, causing gridlock and backing up some of our courts to a state of emergency."[13] They exhorted viewers and listeners to "[c]ontact Senators Feingold and Kohl and tell them to oppose the filibuster," but instead of providing a phone number or e-mail address, they told the audience to go to BeFair.org, a website

––––––––

[13] These quotations are taken from the "Wedding" ad, although the relevant language in all of the ads is virtually identical. See *ante*, at 4–6, and nn. 2–3 (principal opinion).

22 FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO LIFE, INC.

SOUTER, J., dissenting

set up by WRTL. A visit to this website would erase any doubt a listener or viewer might have as to whether Senators Feingold and Kohl were part of the "group" condemned in the ads: it displayed a document that criticized the two Senators for voting to filibuster "16 out of 16 times" and accused them of "putting politics into the court system, creating gridlock, and costing taxpayers money." *Id.*, at 86.

WRTL's planned airing of the ads had no apparent relation to any Senate filibuster vote but was keyed to the timing of the senatorial election. WRTL began broadcasting the ads on July 26, 2004, four days after the Senate recessed for the summer, and although the filibuster controversy raged on through 2005, WRTL did not resume running the ads after the election. *Id.*, at 29, 32. During the campaign period that the ads did cover, Senator Feingold's support of the filibusters was a prominent issue. His position was well known,[14] and his Republican opponents, who vocally opposed the filibusters, made the issue a major talking point in their campaigns against him.[15]

In sum, any Wisconsin voter who paid attention would have known that Democratic Senator Feingold supported filibusters against Republican presidential judicial nominees, that the propriety of the filibusters was a major issue in the senatorial campaign, and that WRTL along with the Senator's Republican challengers opposed his reelection because of his position on filibusters. Any alert

_____

[14] See, *e.g.*, Hearing before the Subcommittee on the Constitution, Civil Rights and Property Rights of the Senate Committee on the Judiciary, 108th Congress, 1st Sess., 5–7 (2003) (statement of Sen. Feingold).

[15] See Gilbert, 3 Seeking Feingold Seat Attack Him on Judges Issue, Milwaukee Journal Sentinel, Nov. 18, 2003, App. 70–76 ("In Wisconsin, the three Republicans vying to take on Senate Democrat Russ Feingold are attacking him on judges and assert the controversy resonates with voters").

voters who heard or saw WRTL's ads would have understood that WRTL was telling them that the Senator's position on the filibusters should be grounds to vote against him.

Given these facts, it is beyond all reasonable debate that the ads are constitutionally subject to regulation under *McConnell*. There, we noted that BCRA was meant to remedy the problem of "[s]o-called issue ads" being used "to advocate the election or defeat of clearly identified federal candidates." 540 U. S., at 126. We then gave a paradigmatic example of these electioneering ads subject to regulation, saying that "[l]ittle difference existed . . . between an ad that urged viewers to 'vote against Jane Doe' and one that condemned Jane Doe's record on a particular issue before exhorting viewers to 'call Jane Doe and tell her what you think.'" *Id.*, at 126–127.

The WRTL ads were indistinguishable from the Jane Doe ad; they "condemned [Senator Feingold's] record on a particular issue" and exhorted the public to contact him and "tell [him] what you think."[16] And just as anyone who heard the Jane Doe ad would understand that the point was to defeat Doe, anyone who heard the Feingold ads (let alone anyone who went to the website they named) would know that WRTL's message was to vote against Feingold. If it is now unconstitutional to restrict WRTL's Feingold ads, then it follows that §203 can no longer be applied constitutionally to *McConnell*'s Jane Doe paradigm.

*McConnell*'s holding that §203 is facially constitutional is overruled. By what steps does the principal opinion reach this unacknowledged result less than four years after *McConnell* was decided?

--------

[16] That the ads purported to target Senator Kohl as well as Senator Feingold is of little import; since the ads would have run during the peak of the 2004 campaign, the audience's focus would naturally fall more heavily on Senator Feingold (who was up for reelection) rather than Senator Kohl (who was not).

24    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

SOUTER, J., dissenting

A

First, it lays down a new test to identify a severely limited class of ads that may constitutionally be regulated as electioneering communications, a test that is flatly contrary to *McConnell*. An ad is the equivalent of express advocacy and subject to regulation, the opinion says, only if it is "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate." *Ante*, at 16. Since the Feingold ads could, in isolation, be read as at least including calls to communicate views on filibusters to the two Senators, those ads cannot be treated as the functional equivalent of express advocacy to elect or defeat anyone, and therefore may not constitutionally be regulated at all.

But the same could have been said of the hypothetical Jane Doe ad. Its spoken message ended with the instruction to tell Doe what the voter thinks. The same could also have been said of the actual Yellowtail ad. Yet in *McConnell*, we gave the Jane Doe ad as the paradigm of a broadcast message that could be constitutionally regulated as election conduct, and we explicitly described the Yellowtail ad as a "striking example" of one that was "clearly intended to influence the election," *McConnell*, 540 U. S., at 193, and n. 78.

The principal opinion, in other words, simply inverts what we said in *McConnell*. While we left open the possibility of a "genuine" or "pure" issue ad that might not be open to regulation under §203, *id.*, at 206–207, and n. 88, we meant that an issue ad without campaign advocacy could escape the restriction. The implication of the adjectives "genuine" and "pure" is unmistakable: if an ad is reasonably understood as going beyond a discussion of issues (that is, if it can be understood as electoral advocacy), then by definition it is not "genuine" or "pure." But the principal opinion inexplicably wrings the opposite conclusion from those words: if an ad is susceptible to any

"reasonable interpretation other than as an appeal to vote for or against a specific candidate," then it must be a "pure" or "genuine" issue ad. *Ante*, at 16. This stands *McConnell* on its head, and on this reasoning it is possible that even some ads with magic words could not be regulated.

## B

Second, the principal opinion seems to defend this inversion of *McConnell* as a necessary alternative to an unadministrable subjective test for the equivalence of express (and regulable) electioneering advocacy. The principal opinion acknowledges, of course, that in *McConnell* we said that "[t]he justifications for the regulation of express advocacy apply equally to ads aired during [the period shortly before an election] if the ads are intended to influence the voters' decisions and have that effect." 540 U. S., at 206. But THE CHIEF JUSTICE says that statement in *McConnell* cannot be accepted at face value because we could not, consistent with precedent, have focused our First Amendment enquiry on whether "the speaker actually intended to affect an election." *Ante*, at 14.[17] THE

---

[17] THE CHIEF JUSTICE says that *Buckley* v. *Valeo*, 424 U. S. 1 (1976) *(per curiam)*, "already rejected" any test that calls for an assessment of the intent and effect of corporate electioneering. *Ante*, at 13. The "reject[ion]" to which THE CHIEF JUSTICE presumably refers is *Buckley*'s quotation of *Thomas* v. *Collins*, 323 U. S. 516 (1945), where we found impermissibly vague a statute that permitted a union leader to "'laud unionism'" but forbade him to "imply an invitation" to join a union. *Id.*, at 534. The problem with this predicament, we reasoned, was the lack of a clearly permissible opportunity for expression: Whether words "designed to fall short of invitation would miss that mark is a question both of intent and of effect," and no speaker "safely could assume that anything he might say . . . would not be understood by some as an invitation." *Id.*, at 535. We then specified that the speaker in *Thomas* was left with an impermissibly limited universe of "three choices: (1) to stand on his right and speak freely; (2) to quit, refusing entirely to speak; (3) to trim, and even thus to risk the penalty." *Id.*, at 536.

26    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO LIFE, INC.

SOUTER, J., dissenting

CHIEF JUSTICE suggests it is more likely that the *McConnell* opinion inadvertently borrowed the language of "intended . . . effect[s]," 540 U. S., at 206, from academic studies in the record of viewers' perceptions of the ads' purposes, *ante*, at 12.[18]

_____

THE CHIEF JUSTICE implies that considering the intent and effect of corporate advertising during as-applied challenges to §203 would put corporations in precisely the same bind; thus, he wonders how *McConnell* could use the language of intent and effect without "even address[ing] what *Buckley*" (and by extension, *Thomas*) "had to say on the subject." *Ante*, at 14. But one need not look far in our *McConnell* opinion to understand why we thought that corporations have more than the constrained set of options available to the union leader in *Thomas*. Just a few sentences after holding that ads with electioneering intent and effect are regulable, we gave this explanation: "in the future corporations and unions may finance genuine issue ads [shortly before an election] by simply avoiding any specific reference to federal candidates, or in doubtful cases by paying for the ad from a segregated fund." 540 U. S., at 206. In other words, corporations can find refuge in constitutionally sufficient and clearly delineated safe harbors by modifying the content of their ads (by omitting a candidate's name) or by altering the sources of their ads' financing (from general treasuries to PACs). THE CHIEF JUSTICE thus wrongly jettisons our conclusions about the constitutionality of regulating ads with electioneering purpose; we meant what we said in *McConnell*, and we did not overlook First Amendment jurisprudence when we said it. Whereas THE CHIEF JUSTICE says that BCRA "should provide a safe harbor for those who wish to exercise First Amendment rights," *ante*, at 14, we already held in *McConnell* that the campaign finance law accomplishes precisely that.

[18]THE CHIEF JUSTICE speculates that *McConnell* derived its test for functional equivalence from "[t]wo key studies," *ante*, at 12, but not a shred of language in *McConnell* supports that theory. In stating the legal standard, *McConnell* made no mention of any study. What is the authority, then, for asserting that the studies were pivotal to the standard we announced in *McConnell?* See *ante*, at 12. Other than WRTL's brief, THE CHIEF JUSTICE cites only Judge Henderson's separate district court opinion in *McConnell*. *Ante*, at 12. But THE CHIEF JUSTICE quotes one part of Judge Henderson's analysis and neglects to mention that she in turn was quoting the lead author of one of the studies in question: "According to the Brennan Center, the *Buying Time*

If THE CHIEF JUSTICE were correct that *McConnell* made the constitutional application of §203 contingent on whether a corporation's "motives were pure," or its issue advocacy "subjective[ly] sincer[e]," *ante*, at 14 (internal quotation marks omitted), then I, too, might be inclined to reconsider *McConnell*'s language. But *McConnell* did not do that. It did not purport to draw constitutional lines based on the subjective motivations of corporations (or their principals) sponsoring political ads, but merely described our test for equivalence to express advocacy as resting on the ads' "electioneering purpose," which will be objectively apparent from those ads' content and context (as these cases and the examples cited in *McConnell* readily show). We therefore held that §203 was not substantially overbroad because "the vast majority of ads clearly had such a purpose," and consequently could be regulated consistent with the First Amendment. 540 U. S., at 206.

For that matter, if the studies to which THE CHIEF JUSTICE refers were now to inform our reading of *McConnell*, they would merely underscore the objective character of the proper way to determine whether §203 is constitutional as applied to a given ad. The authors of those studies did not conduct discovery of the "actua[l] inten[tions]," *ante*, at 14, behind any ads; nor, to my knowledge, were the sponsors of campaign ads summoned before researchers to explain their motivations. The studies merely confirmed that "reasonable people are . . . able to discern between ads whose primary purpose is to support a candidate and those intended to provide information about a policy issue." J. Krasno & D. Seltz, Buying Time: Televi-

---

reports were 'the central piece of evidence marshaled by defenders of' BCRA's electioneering communication provisions 'in support of their constitutional validity.'" *McConnell*, 251 F. Supp. 2d, at 307–308 (opinion of Henderson, J.) (italics in original) (quoting deposition of Craig P. Holman, principal co-author of Buying Time 2000: Television Advertising in the 2000 Federal Elections (Brennan Center 2001)).

28    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

SOUTER, J., dissenting

sion Advertising in the 1998 Congressional Elections 9
(2000). To be clear, I am not endorsing the precise meth-
odology of those studies (and THE CHIEF JUSTICE is correct
that we did not do so in *McConnell*, *ante*, at 13, n. 4); the
point is only that the studies relied on a "reasonable"
person's understanding of the ads' apparent purpose, and
thus were no less objective than THE CHIEF JUSTICE's own
approach.

A similarly mistaken fear of an unadministrable and
speech-chilling subjective regime seems to underlie THE
CHIEF JUSTICE's unwillingness to acknowledge the part
that consideration of an ad's context necessarily plays in
any realistic assessment of its meaning. A reasonable
Wisconsinite watching or listening to WRTL's ads would
likely ask and answer some obvious questions about their
circumstances. Is the group that sponsors these ads the
same one publicly campaigning against Senator Feingold's
reelection? THE CHIEF JUSTICE says that this information
is "beside the point," because WRTL's history of overt
electioneering only "goes to [its] subjective intent." *Ante*,
at 18. Did these "issue" ads begin appearing on the air
during the election season, rather than at the time the
filibuster "issue" was in fact being debated in the Senate?
This, too, is said to be irrelevant. *Ante*, at 19. And does
the website to which WRTL's ads direct viewers contain
material expressly advocating Senator Feingold's defeat?
This enquiry is dismissed as being "one step removed from
the text of the ads themselves." *Ante*, at 20. But these
questions are central to the meaning of the ads, and any
reasonable person would take account of circumstances in
coming to understand the object of WRTL's ad. And why
not? Each of the contextual facts here can be established
by an objective look at a public record; none requires a
voter (or a litigant) to engage in discovery of evidence
about WRTL's operations or internal communications, and
none goes to a hidden state of mind.

This refusal to see and hear what any listener to WRTL's ads would actually consider produces a rule no different in practice from the one adopted by the District Court, which declined to look beyond the "four corners" of the ads themselves. 466 F. Supp. 2d 195, 207 (DC 2006). Although THE CHIEF JUSTICE ostensibly stops short of categorically foreclosing consideration of context, see *ante*, at 20, the application of his test here makes it difficult to see how relevant contextual evidence could ever be taken into account the way it was in *McConnell*,[19] and it is hard to imagine THE CHIEF JUSTICE would ever find an ad to be "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate," *ante*, at 16, unless it contained words of express advocacy. THE CHIEF JUSTICE thus effectively reinstates the same toothless "magic words" criterion of regulable electioneering that led Congress to enact BCRA in the first place.

C

Third, it may be that the principal opinion rejects *McConnell* on the erroneous assumption that §203 flatly bans independent electioneering communications by a corporation. THE CHIEF JUSTICE argues that corporations must receive "the benefit of any doubt," *ante*, at 16, when-

---

[19] Like the District Court, the only bit of context THE CHIEF JUSTICE would allow the reasonable listener is the congressional agenda: whether the "'issue'" addressed in an ad currently is, or soon will be, "'the subject of legislative scrutiny.'" *Ante*, at 20 (quoting 466 F. Supp. 2d, at 207). For example, THE CHIEF JUSTICE says, there would have been "no reason" to think that WRTL's ad constituted anything but a pure issue ad if it addressed a bill pending during Senator Feingold's reelection campaign, such as the Universal National Service Act. *Ante*, at 17. It is revealing, of course, that THE CHIEF JUSTICE does not invoke the filibuster issue, the subject of WRTL's ads, as the legislative matter with particular salience during the 2004 election. But why the reasonable listener can look to Congress but not the calendar on the wall or a WRTL website is difficult to fathom.

30    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

SOUTER, J., dissenting

ever we undertake the task of "separating . . . political speech protected under the First Amendment from that which may be banned," *ante*, at 13.  But this is a fundamental misconception of the task at hand:  we have already held that it is "'simply wrong' to view [§203] as a 'complete ban' on expression," because PAC financing provides corporations "with a constitutionally sufficient opportunity to engage in express advocacy."[20]  *McConnell*, 540 U. S., at 203–204 (quoting *Beaumont*, 539 U. S., at 162).  Thus, a successful as-applied challenger to §203 should necessarily show, at the least, that it could not constitutionally be subjected to the administrative rules that govern a PAC's formation and operation.  See *id.*, at 163.  This would be an uphill fight, after our repeated affirmations that the PAC structure does not impose excessive burdens, *ibid.* (citing *National Right to Work Comm.*, 459 U. S., at 201–202), and WRTL has a particularly weak position on this point: it set up its own PAC long before the 2004 election, used it to campaign openly against Senator Feingold in the past, and could have raised noncorporate donations to it in the 2004 election cycle.  Any argument that establishing and maintaining a PAC is unconstitutionally burdensome for WRTL would thus likely be futile, and certainly should not prevail on WRTL's summary judgment motion.

For that matter, even without the PAC alternative, it would be untrue that §203 "banned" WRTL from saying anything a genuine issue ad would say, for WRTL could have availed itself of either or both of the following additional options.  It is undisputed that WRTL's ads could have been broadcast lawfully in the runup to the election

--------

[20]JUSTICE SCALIA also adopts the same misconception that §203 is a "ban" on speech.  See *ante*, at 18 ("Section 203's line is bright, but it bans vast amounts of political advocacy indistinguishable from hitherto protected speech").

(and bankrolled from WRTL's general treasury) if Senator Feingold's name had been omitted and the Senator not otherwise singled out. Since members of today's majority apparently view WRTL's broadcasts either as "genuine issue ad[s]," *ante*, at 16 (opinion of THE CHIEF JUSTICE), or as "lobby[ing] Wisconsin voters concerning the filibustering of the President's judicial nominees," *ante*, at 2 (SCALIA, J., concurring in part and concurring in judgment), a claim that omitting Senator Feingold's name would "ban" WRTL's message is specious. Yet one searches my Brothers' opinions in vain for any persuasive reason why substituting the phrase "Contact your Senators" for the phrase "Contact Senators Feingold and Kohl" would have denied WRTL a constitutionally sufficient (and clearly lawful) alternative way to send its message. If WRTL is to be believed when it claims that the issue was the point of the ads, it would have lost nothing by referring simply to the "Senators."

Finally, the suggestion that §203 is a ban on political speech is belied by *MCFL*'s safe harbor for nonprofit advocacy corporations: under that rule, WRTL would have been free to attack Senator Feingold by name at any time with ads funded from its corporate treasury, if it had not also chosen to serve as a funnel for hundreds of thousands of dollars from other corporations. Thus, what is called a "ban" on speech is a limit on the financing of electioneering broadcasts by entities that refuse to take advantage of the PAC structure but insist on acting as conduits from the campaign war chests of business corporations.

## D

In sum, *McConnell* does not graft a subjective standard onto campaign regulation, the context of campaign advertising cannot sensibly be ignored, and §203 is not a ban on speech. What cannot be gainsaid, in any event, is that in treating these subjects as it does, the operative opinion

32    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

SOUTER, J., dissenting

produces the result of overruling *McConnell*'s holding on §203, less than four years in the Reports. Anyone who doubts that need merely ask what the law would have been if, back in 2003, this Court had held §203 facially unconstitutional.

BCRA's definition of "electioneering communication," which identifies the communications regulable under §203, includes a backup to be used if the primary definition "is held to be constitutionally insufficient by final judicial decision to support the regulation provided herein." 2 U. S. C. §434(f)(3)(A)(ii) (2000 ed., Supp. IV). If this should occur, "electioneering communication" is to be defined as

> "any broadcast, cable, or satellite communication which promotes or supports a candidate for that office, or attacks or opposes a candidate for that office (regardless of whether the communication expressly advocates a vote for or against a candidate) and which also is suggestive of no plausible meaning other than an exhortation to vote for or against a specific candidate." *Ibid.*

This backup sounds familiar because it is essentially identical to THE CHIEF JUSTICE's test for evaluating an as-applied challenge to the original definition of "electioneering communication": regulation is permissible only if the communication is "susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate," *ante*, at 16. Thus does the principal opinion institute the very standard that would have prevailed if the Court formally overruled *McConnell*. There is neither a theoretical nor a practical basis to claim that *McConnell*'s treatment of §203 survives.

E

The price of *McConnell*'s demise as authority on §203 seems to me to be a high one. The Court (and, I think, the

country) loses when important precedent is overruled without good reason, and there is no justification for departing from our usual rule of *stare decisis* here. The same combination of alternatives that was available to corporations affected by *McConnell* in 2003 is available today: WRTL could have run a newspaper ad, could have paid for the broadcast ads through its PAC, could have established itself as an *MCFL* organization free of corporate money, and could have said "call your Senators" instead of naming Senator Feingold in its ads broadcasted just before the election. Nothing in the related law surrounding §203 has changed in any way, let alone in any way that undermines *McConnell*'s rationale. See *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833, 854–855 (1992).

Nor can any serious argument be made that *McConnell*'s holding has been "unworkable in practice." *Allied-Signal, Inc.* v. *Director, Div. of Taxation*, 504 U. S. 768, 783 (1992) (internal quotation marks omitted). *McConnell* validated a clear rule resting on mostly bright-line conditions, and there is no indication that the statute has been difficult to apply.[21] Although WRTL contends that the as-applied remedy has proven to be "[i]nadequate" because such challenges cannot be litigated quickly enough to avoid being mooted, Brief for Appellee 65–66, nothing prevents an advertiser from obtaining a preliminary injunction if it can qualify for one, and WRTL does not point to any evidence that district courts have been unable to

_____

[21] These as-applied challenges provide no reason to second-guess our conclusion in *McConnell* that the rule for differentiating between electioneering ads and genuine issue ads is administrable. WRTL's ads clearly have an electioneering purpose and, as explained above, fall comfortably within the heartland of electioneering communications that §203 may validly regulate. Thus, although JUSTICE SCALIA claims that "[t]oday's cases make it apparent" that *McConnell* must be overruled, *ante*, at 18, there is nothing about today's cases that suggests that *McConnell* is unworkable. We therefore have no occasion to reconsider *McConnell* from first principles.

34    FEDERAL ELECTION COMM'N *v.* WISCONSIN RIGHT TO
LIFE, INC.

SOUTER, J., dissenting

rule on any such matters in a timely way.

Finally, it goes without saying that nothing has changed about the facts. In Justice Frankfurter's words, they demonstrate a threat to "the integrity of our electoral process," *Automobile Workers*, 352 U. S., at 570, which for a century now Congress has repeatedly found to be imperiled by corporate, and later union, money: witness the Tillman Act, Taft-Hartley, FECA, and BCRA. See Part II, *supra*. *McConnell* was our latest decision vindicating clear and reasonable boundaries that Congress has drawn to limit "'the corrosive and distorting effects of immense aggregations of wealth,'" 540 U. S., at 205 (quoting *Austin*, 494 U. S., at 660), and the decision could claim the justification of ongoing fact as well as decisional history in recognizing Congress's authority to protect the integrity of elections from the distortion of corporate and union funds.

After today, the ban on contributions by corporations and unions and the limitation on their corrosive spending when they enter the political arena are open to easy circumvention, and the possibilities for regulating corporate and union campaign money are unclear. The ban on contributions will mean nothing much, now that companies and unions can save candidates the expense of advertising directly, simply by running "issue ads" without express advocacy, or by funneling the money through an independent corporation like WRTL.

But the understanding of the voters and the Congress that this kind of corporate and union spending seriously jeopardizes the integrity of democratic government will remain. The facts are too powerful to be ignored, and further efforts at campaign finance reform will come. It is only the legal landscape that now is altered, and it may be that today's departure from precedent will drive further reexamination of the constitutional analysis: of the distinction between contributions and expenditures, or the relation between spending and speech, which have given

structure to our thinking since *Buckley* itself was decided.

I cannot tell what the future will force upon us, but I respectfully dissent from this judgment today.